STATE OF NORTH CAROLINA v. DANIEL ROSS

No. 18

(Filed 15 October 1969)

**1. Criminal Law § 88; Witnesses § 8— cross-examination of defendant — collateral matters — negative answers — harmless error**

In this homicide prosecution, the trial court did not commit prejudicial error in its rulings on defendant's objections to questions which the solicitor asked the defendant on cross-examination, where the questions involved collateral matters and the defendant's negative answers were conclusive and rendered the questions harmless.

**2. Criminal Law § 88; Witnesses § 8— rulings on cross-examination — appellate review**

Trial court's rulings on objections to cross-examination should not be disturbed except when prejudicial error is disclosed, since the trial court hears all witnesses, observes their demeanor, knows the background of the case and is thus in a favorable position to control the scope of cross-examination.

**3. Homicide § 20; Criminal Law § 42— bullets taken from victim's body — identification — admissibility**

In this homicide prosecution, two bullets introduced by the State over defendant's objection were properly identified and therefore admissible in evidence, where the pathologist who performed an autopsy on the victim testified that he removed two bullets from the victim's body and marked them for identification, and that one of these bullets pierced the victim's heart and caused her death.

**4. Homicide § 30— instructions — necessity for submission of involuntary manslaughter**

In this prosecution for first degree murder, the evidence neither required nor permitted the court to charge the jury that it might return a verdict of involuntary manslaughter.

APPEAL by defendant from *Carr, J.,* March 17, 1969 Session, WAKE Superior Court.

The defendant, Daniel Ross, was indicted, tried, convicted and given a sentence of life imprisonment for the first degree murder of his wife, Mary Elizabeth Young Ross. The State's evidence disclosed the defendant and his wife, prior to November, 1968, were living in a state of separation — he in New York; she and their two children with her mother (Mrs. Young) in Raleigh. On the afternoon of November 2, the defendant and his sister appeared at the Young home, from which they took the defendant's wife and the two children to the shopping center in North Hills. On their return to the Young home, the defendant and his wife entered the house. The wife's brother, Leon Young, age 17 years, testified:

> ". . . I was outside and I heard two shots and I ran into the house and I saw Daniel coming out the front room standing to the hall. Then he went outdoors, unloaded the gun, and came back and shot again. . . .
>
> I could see Daniel standing on the porch as he unloaded the pistol, reloaded it, and shot my sister, who was standing in the middle room of the house. I could see my sister before the last shot was fired and she was not injured. After the last shot, I saw an injury on her right elbow and I saw blood. She did not have a weapon of any kind and I did not hear any conversation between my sister and Daniel Ross.
>
> . . . After the shot was fired, Daniel Ross ran to his sister's car, said something about the hospital, and they drove away. I did not see any injuries on Daniel Ross."

Charles McAllister, another witness to part of the difficulty, testified that while he was in the bathroom he heard a couple of shots. Later, he heard another shot. ". . . I came out of the bathroom and Daniel Ross was standing in the hallway shooting Mary, who was also in the hallway. I heard approximately five shots in all. Mary fell in the hallway and I grabbed her and put a pillow under her head. . . . After the last group of shots, Daniel Ross got in his car and drive away."

Immediately after the shooting, the defendant fled to New York. He was arrested there and returned to North Carolina for trial.

Dr. Pate, who performed the autopsy, testified:

> ". . . I noticed four bullet wounds in all. There was a bullet wound which entered the center of the chest, right on the breastbone. There was a bullet wound in the left flank region. There was another bullet wound that entered just above the left elbow and right on the opposite side of the arm was an exit wound

for that bullet. And there was a bullet wound in the left wrist and on the opposite side, an exit wound. I performed an autopsy on the body and it is my opinion that Mrs. Ross died as a result of a gunshot wound to the heart. I recovered two bullets from Mrs. Ross' body. I initialed these bullets so I could identify them and I turned them over to Mr. J. E. Pearce on November 4, 1968."

Dr. Pate identified the bullets. They were introduced in evidence over defendant's objection.

After motion for nonsuit was made and denied, the defendant testified that after he, his wife and children returned from the shopping center and entered the Young home, his wife asked defendant's sister to leave the room so she and her husband could talk privately.

"My wife and I had a conversation about a girl that I used to mess around with. At that time, Leon Young came inside the room and went into the kitchen. Mary walked to the kitchen and whispered something in his ear.

"My wife and Leon were in the kitchen talking and Leon picked up a knife, fork, or something. When I got up and started back in the room, my wife, all of a sudden, stabbed me in the back of the neck. It felt something like a sting. . . . When I turned around, I turned around shooting. My wife had one arm up with a knife in her hand. I shot twice.

"Charles McAllister came out of the bathroom and Leon approached me with some object in his hand as I was standing on the steps. I unloaded the gun, put another bullet in the gun, and fired a shot toward Leon. . . ."

The defendant's sister, as a rebuttal witness for him, corroborated his evidence that he had a profusely bleeding wound on his neck.

The jury returned a verdict of guilty of murder in the first degree and as a part of the verdict recommended that the defendant's punishment be imprisonment for life in the State's prison. From the judgment imposing a life sentence, the defendant gave notice of appeal assigning errors.

*Robert Morgan, Attorney General; Ralph Moody, Deputy Attorney General, for the State.*

*Liles & Merriman by William W. Merriman, III, for the defendant.*

HIGGINS, J.

[1] In his brief, the defendant discusses ten exceptive assignments, eight of which involve objections to the solicitor's cross examination

of the defendant, who testified as a witness in his own defense. The cross examination covered nine pages of the record. Under the solicitor's questions, the defendant admitted he had been convicted on a charge of assault on a female with a deadly weapon. He testified he was placed on probation and ordered to pay damages. He contended the shooting was an accident. He was convicted of larceny when he was a minor. He admitted he had been indicted for rape but was acquitted. Perhaps some of the solicitor's questions were objectionable. However, they involved collateral matters. The defendant's negative answers were conclusive and rendered the questions harmless. *State v. King,* 224 N.C. 329, 30 S.E. 2d 230; Strong's N. C. Index, 2d Ed., Witnesses, Sec. 8, Vol. 7, p. 701, et seq.

[1, 2]    Unquestionably in a trial for homicide only the survivor can testify. The prosecuting officer has the right, and it is his duty, to cross examine a defendant who testifies in his own defense. A well directed cross examination may disclose fallacies, if any, in the defendant's testimony and thus aid the jury in its search for the truth. A cross examination, especially where there are no eye witnesses, should be searching, but at all times it should be fair. The trial judge hears all witnesses and observes their demeanor as they testify. He knows the background of the case and is thus in a favorable position to control the scope of the cross examination. The appellate court reviews a cold record. For this reason, the trial court, because of its favored position, should have wide discretion in the control of the trial. Its rulings should not be disturbed except when prejudicial error is disclosed. *State v. Sheffield,* 251 N.C. 309, 111 S.E. 2d 195; *State v. Stone,* 226 N.C. 97, 36 S.E. 2d 704; *State v. Wray,* 217 N.C. 167, 7 S.E. 2d 468; *State v. Beal,* 199 N.C. 278, 154 S.E. 604; *State v. Davidson,* 67 N.C. 119; *State v. Patterson,* 24 N.C. 346; Wigmore on Evidence, 3d Ed., 495. The careful and painstaking judge who tried this case did not commit prejudicial error in his rulings on defendant's objections interposed during the cross examination.

[3]    The two bullets which the State introduced in evidence over defendant's objection were properly identified and therefore admissible in evidence. Dr. Pate, the Pathologist who performed the autopsy, testified he removed two bullets from Mrs. Ross' body and marked them for identification. He testified one of these bullets pierced the heart and caused death. His identification before the court and jury at the trial made them admissible. "It is permissible to identify something taken from a human body by direct testimony of a witness that to his personal knowledge it is the thing in

question." 21 A.L.R. 2d 1219; *State v. Stroud,* 254 N.C. 765, 119 S.E. 2d 907; *State v. Jarrett,* 271 N.C. 576, 157 S.E. 2d 4.

[4]    In addition to the objection to the cross examination of the defendant and the introduction of the bullets in evidence, the defendant contends the court committed error in failing to charge the jury that it might render a verdict of involuntary manslaughter. The court charged the jury that under the evidence it might render one of these verdicts: (1) guilty of murder in the first degree; (2) guilty of murder in the first degree with recommendation that the punishment be imprisonment for life in the State's prison; (3) guilty of murder in the second degree; (4) guilty of manslaughter; (5) not guilty. The court charged fully and correctly on the burden and intensity of the proof required to support each of the permissible verdicts of guilty; and that the failure of the State to carry the burden required a verdict of not guilty. The court charged fully and correctly on the defendant's right to defend himself and to repel felonious assault.

The State's evidence revealed the defendant fired 4 or 5 shots at his wife who was unarmed. After the first series of shots, he stepped outside the hall, reloaded his pistol, returned and fired what perhaps was the fatal shot. The evidence was sufficient to support a conviction of murder in the first degree. The jury, as it had the right to do, fixed the punishment at life imprisonment.

While the defendant did not point out and assign as error any particular or designated portion of the charge as required by appellate rules, we have examined the charge and conclude it is in accordance with legal requirements and is unobjectionable. The evidence neither required nor permitted the court to charge on involuntary manslaughter.

No error.