STATE OF NORTH CAROLINA v. LEON NELSON BURGIN

No. 75A84

(Filed 7 May 1985)

1. **Criminal Law § 85.3— cross-examination—evidence of bad character—not improper**

   In a prosecution for first-degree sexual offense with a seven-year-old child, the court did not permit an improper cross-examination of defendant and his witnesses where defendant did not object to some of the questions, defendant categorically denied taking any girls to a motel for illegal purposes or that he had done anything wrong with a particular girl, the State accepted defendant's denial of any wrongdoing at a restaurant he had formerly owned, defendant had opened the door for testimony about a prior marijuana conviction and his relationship with his own children during direct examination, and questions asked character witnesses were proper to test the witnesses' knowledge and acquaintance with defendant.

2. **Criminal Law § 101.4— jury's request to rehear evidence—no error in instruction denying**

   In a prosecution for first-degree sexual offense with a seven-year-old child, the trial judge did not abuse his discretion when he denied the jury's request that the court read back to them some of the testimony and instructed the jury that all twelve jurors should use their own memory. G.S. 15A-1233.

   Justice VAUGHN did not participate in the consideration or decision of this case.

   Justice MARTIN concurring.

   Justice EXUM dissenting.

DEFENDANT appeals as a matter of right pursuant to G.S. 7A-27(a) from judgment entered by *Howell, J.,* at the 5 December 1983 session of Superior Court, BUNCOMBE County, sentencing him to the mandatory term of life imprisonment upon a jury verdict of guilty of a first-degree sexual offense in violation of G.S. 14-27.4.

*Rufus L. Edmisten, Attorney General, by Thomas H. Davis, Jr., Assistant Attorney General, for the State-appellee.*

*Adam B. Stein, Appellate Defender, by Ann B. Petersen, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Defendant raises two issues on this appeal. He first argues that the trial court erred in allowing the State to ask certain

questions during cross-examination of defendant and certain of defendant's witnesses. Secondly, defendant contends that the trial court erroneously instructed the jury when the trial court denied the jury's request to have certain testimony read to it after beginning deliberations. After reviewing the record, the parties' briefs and arguments, and the relevant law, we find that the actions complained of by defendant do not constitute error on the part of the trial court.

## FACTS

Evidence for the State tended to show that on Monday, 31 January 1983, the victim was approximately seven years ten months old and lived in a small town in North Carolina with her mother, her stepfather and two younger sisters. On that date, the victim and a younger sister were taken to the home of defendant and his wife while the victim's mother went to the hospital to give birth to a child. On the afternoon of 1 February 1983, while defendant's wife was at work, defendant allegedly put his hand in the victim's pants and rubbed her genitalia. On 2 February 1983, defendant allegedly put some vaseline on one of his fingers and inserted it into the victim's vagina. He told the victim not to tell anyone that he had done this. Defendant also asked the victim to rub him between his legs but she refused.

The victim and her younger sister were taken home the following day when their mother returned from the hospital. Defendant and his wife had supper with the victim's family and then, as they were about to leave, the victim's mother asked the victim to go kiss them "bye." The victim kissed defendant's wife and then went into her bedroom. When the victim's mother went in to ask her why she had not kissed defendant "bye," the victim started crying. When her mother asked her what was wrong, she told her that Leon, the defendant, had rubbed her between her legs and that he had put vaseline on one of his fingers and put it "up into" her.

The victim's mother immediately called the sheriff's department and then took the victim to the hospital. At the hospital, the victim told the examining physician and nurse what defendant had done to her. The physician discovered a small tear in the victim's hymen.

Defendant presented witnesses and testified on his own behalf. His evidence tends to show that he did take care of the victim and her younger sister on the dates in question, although he denies having had any sexual relations with the victim.

## I.

[1]  Defendant first argues that the trial court erred in permitting the State to ask certain questions of defendant and his witnesses during cross-examination. More specifically, defendant contends that the State "improperly chartered a course of proving that the defendant committed the offense in this case by proving with improper inference and innuendo, prior alleged 'bad acts' of the defendant." Thus, as defendant further argues, this improper cross-examination of the defendant and his witnesses deprived him of a fair trial and due process of law. We disagree.

Certain legal principles assist us in determining whether the cross-examination in this case was improper. Generally, when a witness, including a defendant in a criminal case, takes the stand and testifies in his own behalf, the opposing party has an absolute right to cross-examine the witness. *State v. Davis*, 291 N.C. 1, 229 S.E. 2d 285 (1976); *see, e.g.*, 1 Brandis § 35 (2d rev. ed. 1982); McCormick on Evidence § 19 (1984). If the witness during direct examination raises specific issues, he "opens the door" to an inquiry into these subject areas during cross-examination. *State v. Albert*, 303 N.C. 173, 277 S.E. 2d 439 (1981); *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980). Furthermore, our courts have traditionally been liberal in allowing extensive questioning during cross-examination of witnesses. *State v. Huskins*, 209 N.C. 727, 184 S.E. 2d 480 (1936); McCormick on Evidence, *supra*, § 21 (this practice is referred to by legal scholars and commentators as the wide-open cross-examination or the English Rule); 1 Brandis, *supra*, § 35.

"On cross-examination much latitude is given counsel in testing for consistency and probability matters related by a witness on direct examination." *Maddox v. Brown*, 233 N.C. 519, 524, 64 S.E. 2d 864, 867 (1951). One of the primary purposes of allowing cross-examination in this manner is "to elicit further details of the story related on direct, in the hope of presenting a complete picture less unfavorable to the cross-examiner's case; . . ." 1 Brandis, *supra*, § 35 at 145. Evidence thus becomes ad-

missible to explain or rebut other evidence put in by the defendant himself. *State v. Small,* 301 N.C. 436, 272 S.E. 2d 128; *State v. Black,* 230 N.C. 448, 53 S.E. 2d 443 (1949). Finally, the legitimate bounds of cross-examination are largely within the discretion of the trial judge. *State v. Cox,* 296 N.C. 388, 250 S.E. 2d 259 (1979).

Our review of the trial judge's rulings on the objections to questions asked during cross-examination is guided by the following considerations:

> The prosecuting officer has the right, and it is his duty, to cross examine a defendant who testifies in his own defense. A well-directed cross examination may disclose fallacies, if any, in the defendant's testimony and thus aid the jury in its search for the truth. A cross examination, especially where there are no eyewitnesses, should be searching, but at all times it should be fair. The trial judge hears all witnesses and observes their demeanor as they testify. He knows the background of the case and is thus in a favorable position to control the scope of the cross examination. The appellate court reviews a cold record. For this reason, the trial court, because of its favored position, should have wide discretion in the control of the trial. Its rulings should not be disturbed except when prejudicial error is disclosed. (Citations omitted.)

*State v. Ross,* 275 N.C. 550, 553, 169 S.E. 2d 875, 878 (1969), *cert. denied,* 397 U.S. 1050 (1970).

It should be noted at the outset that not all of the allegedly improper questions asked by the State were objected to by defendant's trial counsel. Generally, failure to object at trial to a question waives such objection. *State v. Black,* 308 N.C. 736, 303 S.E. 2d 804 (1983). However, when the improper questioning is so prejudicial or so grave that it results in plain error, a new trial will be granted notwithstanding the absence of an objection. *Id.*

In the case before us, defendant testified on direct as follows:

Q. Now, Mr. Burgin, have you ever had any problems with young children or any kind of sexual problems?

A. No, sir.

Q. I believe that sometime, ten or some odd years ago while you were operating a restaurant, you had a marijuana charge against you.

A. Yes, sir.

Q. I believe you had a traffic charge here four or five years ago.

A. Yes, sir.

Q. Have you had anything else? Violations of the law?

A. No, sir. And, by the way, the marijuana charge was possession in my place of establishment.

Defendant also testified on direct that he had retired from full time employment approximately five years earlier because of a disability and further explained the nature of his disability. Thereafter, on cross-examination defendant was asked the following:

Q. So, basically, you haven't had a full-time job since 1975?

A. No, ma'am.

Q. As part of your treatment, sir, did you go out to Thoms Rehabilitation Center, sir?

A. Yes, ma'am.

Q. And would that have been in 1975?

A. Yes, ma'am.

Q. And—

A. No, ma'am, not in 1975.

Q. When would that have been, sir?

A. It was 1977, I believe.

Q. And were you there more than once; or were you there just once, sir?

A. Just once.

Q. How old were you in 1977? EXCEPTION NO. 8

A. Forty-two, I guess.

Q. Did you meet a girl named Lisa at Thoms Rehabilitation Center? EXCEPTION NO. 9

A. Yes, ma'am.

Q. I believe Lisa was about sixteen at the time? EXCEPTION NO. 10

A. No, she was older than that.

Q. How old? EXCEPTION NO. 11

A. At least she told me she was eighteen years old. She had graduated from high school or was graduating that year.

Q. She was also a patient there, wasn't she, sir?

A. Yes, ma'am.

Q. During that stay, isn't it a fact that you left with Lisa? You left Thoms Rehabilitation Center and took her to the Evergreen Motel, sir?

A. No, ma'am, that is not a fact.

Q. Lisa was in a wheelchair, wasn't she? EXCEPTION NO. 14

A. Yes, ma'am.

Q. She was paralyzed from the waist down, I believe. Is that correct? EXCEPTION NO. 15

A. Yes, ma'am.

Q. Where do you say you and Lisa went, sir? EXCEPTION NO. 16

A. I did not.

    MR. SWAIN: Objection.

    COURT: Sustained.

Defendant failed to object to most of these questions. The one objection made was lodged after the witness responded to the question. Defendant made no motion to strike the answer, and therefore waived the objection. *State v. Goss*, 293 N.C. 147, 235 S.E. 2d 834 (1977); *State v. Battle*, 267 N.C. 513, 148 S.E. 2d 599 (1966). We note that defendant categorically denied that he had

taken Lisa to a motel. Thereafter, on redirect defendant testified that he had never been charged with taking any girls to a motel for illegal purposes and he had never done anything improper with Lisa. Under the circumstances, we do not view this line of questioning to be plain error. *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804.

During further cross-examination, defendant was asked whether the restaurant he owned in 1974 was a "hangout for teenagers" and whether his main clientele was young people. Defendant had referred to his restaurant during direct examination and opened the door to further questions designed to explain his testimony given during direct. The State accepted defendant's denial of any wrongdoing and did not persist in asking the same questions repeatedly. Therefore, the judge did not abuse his discretion in allowing this testimony.

Defendant objected to the following line of questioning during cross-examination:

Q. Do you recall, Mr. Burgin, when the officers came to your place of business?

A. Yes, ma'am.

MR. SWAIN: Objection.

COURT: Sustained.

Q. Mr. Burgin, the day before the officers came, do you remember Rebecca Smith coming into your place of business?

MR. SWAIN: Object.

COURT: Overruled. EXCEPTION NO. 3

Q. Isn't it a fact, Mr. Burgin, that the day before the officers came, you gave Rebecca Smith a quantity of marijuana, sir?

MR. SWAIN: Well, I object to this.

COURT: Overruled. EXCEPTION NO. 4

Q. Isn't that a fact, sir?

A. I honestly don't remember. I did not give her—She bought—she purchased—I don't remember giving her any quantities of marijuana.

Q. You sold it to her then, sir?

A. No, ma'am, I did not sell it to her. No, ma'am.

Q. Who do you say sold it to her, sir?

A. I don't know who sold it to her.

Q. Isn't it a fact that while you were running Leon's you were giving it away for sexual favors to the young girls that were coming to Leon's, sir?

A. Absolutely not.

MR. SWAIN: Objection.

COURT: Overruled.

On redirect, defendant testified that the marijuana he pled guilty to possessing was a bag of stems and seeds found in his briefcase. Other drugs, he stated, were found on the floor of the bathroom in his restaurant and on the floor in the front of the bar. Defendant on direct had testified that he was charged with marijuana possession while operating the restaurant and offered favorable testimony tending to infer that customers had left some of the marijuana found by the officers. Therefore, it was proper for the State to inquire into these matters during cross-examination. Therefore, the judge did not abuse his discretion by allowing this line of questioning.

Defendant next argues that several additional questions asked of him about his restaurant and drug activity during recross-examination by the State were improper. Defendant did not object to any of this questioning. We find no plain error. *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804.

Defendant further assigns as error the admission of certain testimony regarding his relationship with his grown children from his first marriage and their failure to appear in court for their father's, the defendant's, trial. Mrs. Burgin, defendant's present wife, was called as a witness for defendant and testified as follows on direct:

Q. All right, Mrs. Burgin, will you relate to the jury what occurred from the time that you met Mrs. Hughes?

A. Leon and Mr. Hughes stayed in the control room, and she and I went into his office with the children because they made too much noise and it went across the air and he wouldn't let them be in there.

We sat in there and talked from about, well, I would say 15 until 9:00 until Leon and I were ready to come home, and it was around, I would say, 12:00 o'clock. We talked about the fact she and I are almost the same age. She had children, and I do not. She had stepchildren and I had stepchildren. Her stepson, David, I think his name is, was the same age as my stepson, Ronnie. And then she, you know — we were discussing how sometimes his family did not accept her, and I, you know, kind of felt like mine didn't at first but after Leon and I had been married for a while that they did.

I never had any problems with Ronnie or the other two girls, but she had had some problems with her stepson because he had stayed with them for a while, and she told me he had cable television and he watched pornographic movies in the house. And she had asked Sid to do something about it and he never would, so she took it upon herself to pull the cable from the wall so he wouldn't watch the movies anymore.

As part of the State's cross-examination of Mrs. Burgin, the following questions were asked:

Q. And you said you talked with Mrs. Hughes about you [sic] having stepchildren; and you basically talked about general things, is that correct?

A. Yes, it is.

Q. Isn't it a fact that just a few weeks before this incident happened, Mrs. Burgin, that the teenage daughter belonging to your husband showed up on your doorstep and you didn't even know anything about it?

MR. SWAIN: Objection.

COURT: Overruled. EXCEPTION NO. 34

Q. Isn't that a fact?

A. No, it's not.

Q. Didn't you tell Delores down in the Sheriff's Department, that you didn't know how much more you could stand because one day, a few weeks before this happened, a daughter showed up that belonged to Mr. Burgin and you didn't know anything about her. Didn't you tell her that?

MR. SWAIN: Objection.

COURT: Overruled. EXCEPTION NO. 35

A. No, ma'am, I did not.

Q. How many children does your husband have?

A. Three. EXCEPTION NO. 36

Q. What are their names?

A. Ronnie, Shera, and Teresa. EXCEPTION NO. 37

Q. How old are they?

MR. SWAIN: Objection.

COURT: Overruled. EXCEPTION NO. 38

A. Ronnis [sic] is 24. Shera is 19. Teresa is 18.

Q. And they live here in Asheville. Is that correct?

A. Yes, ma'am.

Q. Truth of the matter is, they do not come about their father, do they?

MR. SWAIN: Objection.

COURT: Overruled. EXCEPTION NO. 39

The State's questioning was again designed to delve into subjects presented and raised by the witness during direct examination. As with the foregoing arguments raised by defendant, we do not consider this line of questioning improper. Nor do we view the trial judge as having abused his discretion in allowing the State to present a clear and complete picture of matters alluded to on direct.

The next argument raised by defendant pertains to certain questions asked during cross-examination of one of defendant's

character witnesses. Defendant contends that the questions asked were improper because they were prejudicial and irrelevant. The questions asked by the State were as follows:

> Q. And you lived right next door to him. Is that correct?
>
> A. Yes.
>
> Q. Did you ever meet his kids? EXCEPTION NO. 49
>
> A. Yes.
>
> Q. Are they in the courtroom today? EXCEPTION NO. 50
>
> A. Ronnie's not. Okay, the — Shera, I only met her once. And I don't really remember. And the other one, I never met. But I saw a picture of her. He showed me a picture.

This same character witness stated earlier on direct that she had lived next door to defendant and had visited with him "all the time. . . ." "It has been generally held that a character witness may be cross-examined with respect to the extent of his knowledge and acquaintance with the person in whose behalf he testifies or with regard to the sources of information upon which he bases his estimate of character." *State v. Nelson*, 200 N.C. 69, 72, 156 S.E. 154, 156 (1930). This line of questioning during cross-examination was not objected to by defendant. However, such questions were proper to test the extent of the character witness' knowledge and acquaintance with defendant, the person whose character she was supposed to be familiar with. Therefore, this line of questioning was not prejudicial nor improper.

II.

[2]    The second issue raised by defendant relates to the instruction given by the trial court after the jury had begun deliberations. After the jury began deliberating to determine defendant's guilt or innocence, the jury returned to the courtroom with a request that the court read back to them the testimony of some of the witnesses. In response to this request, the court stated in part:

> All right, ladies and gentlemen, I have received a request that you have submitted. Let me advise you that the Court Reporter has taken down through the stenotype machine the testimony of all the witnesses, and I have the dis-

cretion to order her to type it up and present it. I also have the discretion not to. And in this particular situation, after considering all the factors and the fact that there are twelve of you over there and that you have collective memories, I'm going to exercise my discretion and deny the request that the testimony of the witnesses be read back or provided. Ex-CEPTION NO. 63.

By the time I did this your memories might lapse or some other reason might occur that would make that imprac-tical, so I'm going to let you resume your deliberations and ask you to use your collective memories, and that means all 12 of you, to recall all the evidence in this case. EXCEPTION No. 64.

And again, I emphasize that I could do this if I wanted to, but in this particular case I'm not, in my own discretion. You may now retire.

Defendant contends that these instructions were coercive to the jury because they "could have been interpreted by the jury as a direction to the non-agreeing jurors to compromise their individual recollections of the facts and either surrender their convictions or judgment to the views of the majority or reach agreement by 'collective' or majority vote on the facts in dispute, rather than by unanimous vote." Thus, defendant maintains that the instructions were improper, coercive, and denied defendant his right to due process of law under the federal and state con-stitutions. Defendant's argument is rejected.

As defendant concedes, there are no cases from this Court directly addressing the propriety of an instruction similar to the one set forth above. Instead, defendant relies on and cites a number of cases involving additional instructions given by a judge to a deadlocked jury. *See, e.g., State v. Alston,* 294 N.C. 577, 243 S.E. 2d 354 (1978). We do not consider such cases to be dispositive of the issue before us. Instead, we rely upon G.S. 15A-1233(a), which deals directly with the issue of when a jury's request for a restatement of the evidence can be granted or denied by a trial judge. That statute states in relevant part:

§ *15A-1233.   Review of testimony; use of evidence by the jury.*

(a) If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence. In his discretion the judge may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

Thus, the trial judge has sole discretion to decide this matter. *State v. Dover*, 308 N.C. 372, 302 S.E. 2d 232 (1983). The judge states explicitly in his instruction that his denial of the request was within his discretion. The judge had previously stated to the jury that "it is your duty to recall all of the evidence, whether or not mentioned by me, and to use your own recollection of the evidence. . . ." When the instructions are read in their entirety, it seems clear that the judge was instructing the jury, all twelve members, to use their own memories. We do not consider such an instruction an abuse of the trial judge's discretion. *State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652 (1976). Thus, this instruction was not improper nor prejudicial to defendant.

No error.

Justice VAUGHN did not participate in the consideration or decision of this case.

Justice MARTIN concurring.

Believing as I do that the "plain error" doctrine has no proper place in the law of evidence, I concur in the result reached in part I of the majority opinion. *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983) (Martin, J., concurring). In this regard, it is notable that the Evidence Code, N.C.G.S. 8C, became effective 1 July 1984. It does not contain a reference to the "plain error" doctrine created by the federal courts and adopted by a majority of this Court in *Black*, but, rather, provides that "an appellate court may review errors affecting substantial rights if it determines, in the interest of justice, it is appropriate to do so." N.C. Gen. Stat. § 8C-1, Rule 103(d) (Cum. Supp. 1983). This is no more than what

this Court has always done, and will continue to do, to prevent manifest miscarriage of justice. *Ange v. Ange*, 235 N.C. 506, 71 S.E. 2d 19 (1952); *State v. Cochran*, 230 N.C. 523, 53 S.E. 2d 663 (1949); *Mining Co. v. Mills Co.*, 181 N.C. 361, 107 S.E. 216 (1921).

I concur in the remainder of the opinion.

Justice EXUM dissenting.

Cases like this involving alleged sexual assaults against young children tear at the hearts of us all. Emotions tend to run high and our natural inclination is to want to favor and protect the child. In these cases especially it is important that the courts permit the state to put on all the legitimate evidence it has to prove its case. It is equally important that courts be assiduous to keep out evidence which is both irrelevant to defendant's guilt or innocence or to any other question in the case but which may incline the jury to want to convict defendant for reasons other than evidence of his guilt of the crime for which he is being tried. In the trial of this case so much of this kind of evidence came in that I think there is a possibility a different result would have been reached by the jury had it been kept out. N.C.G.S. § 15A-1443, which requires that a new trial be granted if the error in question results in such a possibility, compels me to vote for a new trial.

The state's evidence consisted primarily of the testimony of the young victim, corroborated by the testimony of several adults that the victim had made statements to them consistent with her trial testimony. There was, however, no testimony by the examining physician concerning a tear in the victim's hymen. Although the physician was subpoenaed by the state, he was never called to testify. Instead, a nurse who assisted the physician testified that she observed a tear in the victim's hymen during the physician's examination of the victim's external genitalia.

Defendant testified in his own behalf and denied his guilt. According to his testimony, he had been previously married and divorced, had three adult children by his former wife and had recently been married about a year to his second wife. He had been minister of music and youth director at several churches in Buncombe County and had gotten to know the victim's parents through his work with a local radio station where the victim's

father was employed as program director and which station broadcast defendant's gospel music.

Defendant's wife volunteered to help the victim's parents, who were new to the community, when they needed babysitting services. Defendant and his wife provided these babysitting services while the victim's mother was giving birth to another child. The victim and her sister stayed with defendant and his wife from Monday, 31 January 1983, until Friday, 4 February 1983. Defendant and his witnesses testified in great detail as to the care defendant, defendant's wife, and others, including defendant's wife's parents who were licensed foster care parents, provided the victim and her sister during this week. Without detailing all of this evidence, I think it fair to say that it does tend to support defendant's innocence of the crime charged.

In addition to this factual evidence, defendant offered several character witnesses who were well acquainted with defendant and who testified that he had a good reputation in the community. Finally, defendant called as a witness a ten-year-old boy who visited defendant's home while the victim was there. The boy testified that while he and the victim were alone in defendant's living room on Monday, 31 January, the victim tried to pull his pants down.

I mention this evidence for the defendant to demonstrate that this was a close, hard-fought case on the issue of guilt.

Much of the offending evidence came in during what I consider to be improper cross-examination of the defendant. In addition to the cross-examination detailed in the majority opinion concerning defendant's activities at Thoms Rehabilitation Center and the incident involving marijuana, defendant was cross-examined about a restaurant he owned in 1974 called "Leon's." The following colloquy occurred:

Q. And basically it was a hangout for teenagers, is that correct?

A. No, ma'am, not basically. It was basically a restaurant.

Q. What did you serve in the restaurant?

A. I served—When I started out there, I served three meals a day. And then I changed when I started selling beer. That's when I started to getting the young folks in there.

Q. Well, after a while, didn't it become sort of like what you call a teenage hangout in the evening, sir?

A. No, ma'am. I never—I never discontinued to serve food as long as I was there.

Q. Well, in the evening hours during the time that you were running 'Leon's'—

MR. SWAIN: Objection, Your Honor.

Q. (Ms. Carlisle continues)—Mr. Burgin, would you say in the evening hours your main clientele were young people?

A. Yes, ma'am.

MR. SWAIN: Object.

COURT: Overruled.

EXCEPTION NO. 2

Under the rules of evidence prevailing when this case was tried, a defendant who testified could be cross-examined for purposes of impeachment about specific acts of misconduct; but general inquiries concerning broad ranges of activity which may or may not be misconduct were not permitted. *State v. Shane,* 304 N.C. 643, 651-52, 285 S.E. 2d 813, 819 (1982) (error to ask on cross-examination whether defendant "resigned from the intelligence unit because of sexual improprieties . . ." because the question was not designed to elicit an affirmance or denial "of 'some identifiable specific act' by means of a detailed reference to 'the time or the place or the victim or any of the circumstances of defendant's alleged prior misconduct'"); *accord, State v. Purcell,* 296 N.C. 728, 732-33, 252 S.E. 2d 772, 775 (1979). *See also, State v. Mason,* 295 N.C. 584, 592-93, 248 S.E. 2d 241, 247 (1978), where this Court held the question, "Were you involved in what you call street gang operations in New York?" inappropriate cross-examination for impeachment purposes.

Except for the question about whether defendant had sold marijuana to Rebecca Smith, none of the complained of cross-

examination referred to alleged specific acts of misconduct. Yet the examination solely by innuendo and suggestion tended to portray defendant in a bad light before the jury and could have inclined the jury to want to convict him because of these innuendoes rather than the evidence relevant to the issue of his guilt.

Finally, the cross-examination of defendant's wife attempted to convey to the jury, again through innuendo and suggestion, that defendant did not have a good relationship with his children. This cross-examination was improper for impeachment purposes and had no relevancy to any issue being tried. Its only purpose, again, was to belittle the defendant in the eyes of the jury and incline the jury to want to convict him for reasons other than evidence of his guilt.

I do not think these instances of improper cross-examination can be sustained on the theory that somehow the defendant "opened the door" to these lines of inquiry by stating on direct examination that he had never "had any problems with young children or any kind of sexual problems" or that he had been convicted of possessing marijuana while "operating a restaurant" some years before. The cross-examination, except by innuendo and suggestion, does not tend to refute these assertions. Further, it is improper "to go into the details of the crime by which the witness is being impeached. Such details usually distract the jury from the issues properly before it, harm the witness and inject confusion into the trial of the case. . . . [T]he time and place of the conviction and the punishment imposed may be inquired into upon cross-examination." *State v. Finch*, 293 N.C. 132, 141, 235 S.E. 2d 819, 825 (1977).

Whether by the "plain error" doctrine or, as the concurring opinion suggests, in "the interest of justice," I believe the extensive cross-examination of defendant and defendant's wife about matters irrelevant to the question of guilt or the witness's credibility yet which solely by innuendo and suggestion paints defendant as a "bad man" before the jury warrants a new trial.