STATE OF NORTH CAROLINA v. DANIEL BRIAN LEE

No. 247A90

(Filed 28 January 1994)

**1. Indigent Persons § 19 (NCI4th)— funds to hire mental health expert—provision of report to State not condition**

The trial court's provision of funds to defendant for the employment of a mental health expert was not conditioned upon a requirement that the expert provide the State with a report of his evaluation of defendant where the record shows that the trial court simply informed defendant of the State's discovery rights which would arise under N.C.G.S. § 15A-905(b) if defendant intended to call the expert as a witness at trial.

**Am Jur 2d, Criminal Law § 955.**

**2. Constitutional Law § 344 (NCI4th)— court's private conferences with prospective jurors—showing of harmless error**

When a trial court conducts private unrecorded conferences with prospective jurors, the trial court commits reversible error unless the State can show that the error was harmless beyond a reasonable doubt. The State may show that the error was harmless beyond a reasonable doubt where the transcript reveals the substance of the trial court's conversation with the juror or where the trial court reconstructs the substance of the conversation on the record.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**3. Constitutional Law § 344 (NCI4th)— excusal of jurors—absence of defendant—reasons shown by record—harmless error**

The trial court's excusal of two prospective jurors outside defendant's presence was harmless error where the record shows that one juror was excused due to her mother's illness and impending surgery and that the second juror was excused due to her own illness, and these are proper grounds for the excusal of jurors.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**4. Constitutional Law § 344 (NCI4th) — unrecorded bench conference — excusal of juror by defense counsel — no violation of defendant's right to be present**

The excusal of a prospective juror following an unrecorded bench conference did not violate defendant's right to be present at all stages of his capital trial where the record clearly reflects that the subject of the bench conference was the possibility of prejudice on the part of the juror; both defense counsel were present at the conference; defendant was present in the courtroom during the conference, was able to observe the context in which it arose, and could inquire of his attorneys regarding its substance; and the juror was excused by defense counsel rather than by the trial court.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**5. Constitutional Law § 344 (NCI4th) — court's ex parte conversation with juror — substance shown by record — harmless error**

The trial court's unrecorded *ex parte* conversation with a juror in a capital trial was harmless beyond a reasonable doubt where the record sufficiently reveals that the substance of the conversation concerned the juror's acquaintance with defendant's sister, a defense witness, and the juror's desire to bring that fact to the court's attention.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**6. Constitutional Law § 342 (NCI4th) — unrecorded bench conferences with counsel — absence of defendant — failure to show usefulness of presence**

Defendant failed to meet his burden of showing the usefulness of his presence at thirty-nine unrecorded bench conferences with trial counsel so that his constitutional rights were not violated by his absence from the bench conferences where the majority of the conferences concerned questions of law or logistical matters; the record shows that nothing occurred, either procedurally or substantively, as a result of the remainder of these bench conferences; defense counsel was present at each of these conferences and defendant was present in the courtroom; and defense counsel did not object to anything that occurred during any of the unrecorded conferences.

**Am Jur 2d, Criminal Law §§ 694 et seq., 901 et seq.**

Exclusion or absence of defendant, pending trial of criminal case, from courtroom, or from conference between court and attorneys, during argument on question of law. 85 ALR2d 1111.

7. **Criminal Law § 507 (NCI4th) — private bench conferences with counsel — recordation not required by statute**

The trial court's denial of defendant's pretrial motion to record all bench conferences in a capital sentencing proceeding did not violate the statute which requires that an "accurate record of all statements from the bench and all other proceedings" be kept by the court reporter, N.C.G.S. § 15A-1241(a), since this statute does not apply to private bench conferences between trial judges and attorneys. However, when a party requests that the subject matter of a private bench conference be put on the record for possible appellate review, the trial judge should comply by reconstructing, as accurately as possible, the matter discussed.

**Am Jur 2d, Appeal and Error §§ 397 et seq.**

8. **Criminal Law § 1322 (NCI4th) — capital sentencing — parole eligibility — instruction not to consider**

When the jury in a capital sentencing proceeding sent a note to the court asking whether the defendant could ever be eligible for parole from sentences imposed for crimes against a second victim, the trial court did not err by failing to inform the jury that defendant would not be eligible for parole in the other case for eighty years and by instructing the jury that it should not consider eligibility for parole in reaching a verdict but should determine the question as though life imprisonment means imprisonment for life.

**Am Jur 2d, Trial §§ 1118, 1443.**

9. **Jury § 111 (NCI4th) — capital sentencing — pretrial publicity — denial of individual voir dire**

The trial court did not abuse its discretion in refusing to allow individual *voir dire* of prospective jurors in a capital sentencing proceeding to enable defendant to examine jurors about their exposure to pretrial publicity where the record shows that the ruling was a reasoned decision by which the court attempted to conserve judicial resources without foreclosing the possibility of allowing individual *voir dire* if it became necessary to ensure a fair jury selection process. Moreover,

any error in the denial of defendant's motion for individual *voir dire* was harmless where defendant was not prevented from making any relevant inquiry necessary to determine whether prospective jurors had been exposed to pretrial publicity and whether any such exposure affected their impartiality, and jurors who had heard about the case and had formed opinions as to the appropriate punishment for defendant were successfully challenged for cause.

**Am Jur 2d, Jury §§ 195 et seq.**

**10. Jury § 141 (NCI4th)— capital sentencing—jury voir dire— exclusion of questions about parole and life imprisonment**

The trial court did not err by refusing to allow the defendant to question prospective jurors in a capital sentencing proceeding about parole eligibility and their understanding as to the meaning of "life imprisonment" since these matters are irrelevant to issues to be determined during the sentencing proceeding.

**Am Jur 2d, Jury §§ 195 et seq.**

**11. Jury § 148 (NCI4th)— capital sentencing—jury voir dire— attitude toward death penalty—exclusion of questions**

The trial court did not err by refusing to allow defendant to ask prospective jurors in a capital sentencing proceeding questions as to why they held their death penalty beliefs, whether they believed the death penalty has a deterrent effect, whether they believed human life is sacred, and whether they believed the death penalty should be reserved for the worst cases where all jurors who were eventually selected stated that they had formed no opinion as to the appropriateness of the death penalty in this case; defendant was not prevented from asking whether jurors believed that life imprisonment may be an appropriate sentence for some first-degree murder cases or whether they believed that the death penalty was appropriate in all cases; and defendant was allowed adequate latitude to assess juror attitudes toward the death penalty and to determine whether the jurors were predisposed to return a recommendation of death or whether they would follow the law and equally consider the evidence in mitigation and aggravation.

**Am Jur 2d, Jury §§ 195 et seq.**

**12. Jury § 131 (NCI4th)— capital sentencing—jury voir dire— questions about understanding of law and belief in jury system—exclusion not prejudicial**

Defendant was not prejudiced by the trial court's refusal to permit him to ask a prospective juror in a capital sentencing proceeding whether she believed in and understood the applicable principles of law where the juror was successfully challenged for cause by the State. Nor was defendant prejudiced by the court's refusal to permit him to ask a prospective juror whether the juror believed in the jury system where defendant received an answer to this question immediately after it was disallowed when the trial judge gave a short explanation of the jury's role in a capital sentencing proceeding, the judge then asked all jurors in the jury box whether any of them disagreed with the jury's role as he had explained it, and no juror indicated disagreement.

**Am Jur 2d, Jury §§ 195 et seq.**

**13. Jury § 139 (NCI4th)— capital sentencing—jury voir dire— failure of defendant to testify—exclusion of question—cure of error**

Any error in the trial court's refusal to permit defendant to ask jurors in a capital sentencing proceeding whether they would hold it against him if he did not testify was cured when, immediately after the State's objection to this question was sustained, the trial court instructed the jurors as to defendant's right not to testify and inquired as to whether they disagreed with this principle of law.

**Am Jur 2d, Jury §§ 195 et seq.**

**14. Evidence and Witnesses § 1671 (NCI4th)— photographs not properly authenticated**

Two photographs purportedly depicting defendant as a child and as a high school senior were not properly authenticated so that their exclusion was not erroneous where the witness through whom defendant sought to introduce the photographs did not know defendant at the time the photographs were taken.

**Am Jur 2d, Evidence § 789.**

**15. Evidence and Witnesses § 2787 (NCI4th) — cross-examination of expert — disagreement with another expert — no expression of opinion on evidence by prosecutor**

Where a neurosurgeon testified in a capital sentencing proceeding that brain damage suffered by defendant was located in an area of the brain that is related to motor skills and he could only hypothesize that the damage affected defendant's behavior, and a neuropsychologist described in detail how defendant's brain damage could have caused the behavioral changes that resulted in defendant's commission of the crimes with which he was charged, the prosecutor did not express his personal opinion that the testimony of the two witnesses was contradictory when he asked the neuropsychologist on cross-examination whether he disagreed with the neurosurgeon since the prosecutor was merely attempting to determine whether testimony by the two witnesses was inconsistent and thus less credible, and witness credibility is a proper and relevant matter for cross-examination.

**Am Jur 2d, Witnesses § 1032.**

**16. Criminal Law § 1310 (NCI4th); Evidence and Witnesses § 2282 (NCI4th) — capital sentencing — expert witnesses — apparent inconsistencies in testimony — refusal to permit explanation — harmless error**

The trial court erred in a capital sentencing proceeding by refusing to permit a neuropsychologist who testified as a defense witness to attempt to explain apparent inconsistencies between his testimony and testimony by a neurosurgeon, another defense witness, as to whether abrupt changes in defendant's behavior and his commission of the crimes charged were attributable to a brain aneurysm and subsequent surgery. However, there was no reasonable possibility that a different result would have been reached at trial if the error had not occurred where the neurosurgeon's expertise was in identifying those portions of defendant's brain that were damaged and the neuropsychologist's expertise was in identifying the behavioral manifestations of those injuries; the testimony by the two experts was consistent overall and this general consistency must have been apparent to the jury; and defendant failed to make an offer of proof as to what the neuro-

psychologist's testimony would have been had the trial court not improperly intervened.

**Am Jur 2d, Criminal Law §§ 527 et seq.; Expert and Opinion Evidence § 241.**

**17. Criminal Law § 1314 (NCI4th) — capital sentencing — emotional state of defendant — drugs or alcohol — proper question**

The trial court did not err by allowing the State to ask a neurosurgeon in a capital sentencing proceeding whether defendant's flat emotional state could have been caused by defendant's prolonged use of marijuana and alcohol where the witness had testified that he found that defendant did not appear to be emotionally affected by the criminal charges he was facing; there was evidence that defendant was a user of marijuana and alcohol prior to his arrest; and whether defendant's flat emotional state was the result of marijuana and alcohol or the result of a brain aneurysm and surgery as defendant contended was a proper subject of inquiry.

**Am Jur 2d, Criminal Law §§ 527 et seq.; Expert and Opinion Evidence § 241.**

**18. Criminal Law § 1345 (NCI4th); Evidence and Witnesses § 1113 (NCI4th) — capital sentencing — statements by defendant — admissions of party opponent — relevancy to prove heinous, atrocious, or cruel aggravating circumstance**

Statements made by defendant to a kidnapping and rape victim that a first-degree murder victim had "died a slow and painful death" and that he had beat the murder victim's head with a stick, kicked her in the throat, and stood on her back while strangling her with her sweater were admissible in the capital sentencing proceeding for the first-degree murder as admissions of a party opponent which were relevant to prove the "especially heinous, atrocious, or cruel" aggravating circumstance because they showed that the murder was unnecessarily torturous and that it exceeded the level of brutality normally present in a first-degree murder. Defendant's statement to the witness that he sexually assaulted the victim prior to killing her was corroborative of evidence that the victim suffered pre-death bruising in her anal area and was also relevant to prove the heinous, atrocious, or cruel circumstance because evidence that defendant sodomized the vic-

tim prior to killing her tended to show the presence of dehumanizing aspects not normally present in a first-degree murder. N.C.G.S. § 8C-1, Rule 801(d).

**Am Jur 2d, Criminal Law §§ 527 et seq.; Expert and Opinion Evidence § 241.**

19. **Criminal Law § 1347 (NCI4th)— capital sentencing—crimes against second victim—course of conduct aggravating circumstance**

Evidence of defendant's crimes against a second victim were relevant and admissible in a capital sentencing proceeding to show that the murder of the victim in this case was part of a course of conduct in which defendant engaged and which included acts of violence against another person where the evidence tended to show that in each case defendant abducted a female victim, whom he believed to be an Appalachian State University student, as she was exercising on the streets of Boone; defendant drove each victim to the same area of the county; defendant sodomized both victims and stole their watches and articles of their clothing which he kept as mementos; defendant told the second victim that he planned to kill her as he had killed the first victim; and defendant committed the crimes against the second victim just five days after he kidnapped and murdered the first victim. N.C.G.S. § 15A-2000(e)(1).

**Am Jur 2d, Criminal Law §§ 527 et seq.; Expert and Opinion Evidence § 241.**

20. **Evidence and Witnesses § 1695 (NCI4th)— photographs of murder victim's body**

Although the victim's identity and the cause of her death were not in dispute in this sentencing proceeding for first-degree murder, photographs depicting the victim's nude body in an advanced stage of decomposition, the manner in which she was strangled, and injuries to her head were admissible to show the circumstances of her death which were relevant in the sentencing proceeding.

**Am Jur 2d, Homicide § 417.**

**21. Criminal Law § 1309 (NCI4th)— capital sentencing— foundational evidence**

Testimony by a murder victim's family and friends describing how they learned of the victim's disappearance and how they came to be involved in the search to find her was not inadmissible "victim impact" evidence but was foundational in nature and properly admitted in this capital sentencing proceeding.

**Am Jur 2d, Criminal Law §§ 527 et seq.**

**22. Criminal Law § 1309 (NCI4th)— capital sentencing— subsequent sentencing for other crimes— evidence properly excluded**

The trial court in a capital sentencing proceeding properly excluded evidence that the court would sentence defendant for kidnapping the victim and for crimes against a second victim at the conclusion of the capital sentencing proceeding since this evidence was not a circumstance that would justify a sentence less than death for the murder for which defendant was being sentenced and was irrelevant. Moreover, any error in the exclusion of this evidence was harmless where defendant was permitted to present evidence that he had previously entered pleas of guilty to the other crimes and that he could receive four life sentences plus fifty years for those crimes.

**Am Jur 2d, Criminal Law §§ 527 et seq.**

**23. Criminal Law § 441 (NCI4th)— capital sentencing— jury argument— contradictory testimony by defendant's experts— supporting evidence**

The prosecutor's jury argument in a capital sentencing proceeding that defendant's expert witnesses had contradicted one another was supported by the evidence where a neurosurgeon testified that he could only hypothesize that defendant's brain damage had caused his emotional and behavioral changes and a neuropsychologist testified that behavioral and emotional changes experienced by defendant were definitely the direct result of defendant's brain aneurysm and subsequent brain surgery.

**Am Jur 2d, Trial §§ 305, 306.**

STATE v. LEE

[335 N.C. 244 (1994)]

**24. Criminal Law § 455 (NCI4th) — capital sentencing — jury arguments for death penalty — signal to others — prevention of defendant from killing again**

It was not improper for the prosecutor to argue to the jury in a capital sentencing proceeding that a recommendation of death would be a signal to others that capital felons would be dealt with severely and that the only way to prevent defendant from killing again was for the jury to return a recommendation of death.

**Am Jur 2d, Trial § 229.**

**25. Criminal Law § 681 (NCI4th) — capital sentencing — impaired capacity mitigating circumstance — peremptory instruction not required**

The trial court did not err by refusing to give the jury in a capital sentencing proceeding a peremptory instruction that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time of the murder because this mitigating circumstance was not supported by uncontroverted evidence where one of defendant's expert witnesses was unable to testify with a reasonable degree of medical certainty that defendant's brain injury resulted in any change in defendant's condition other than some diminution in his motor skills; testimony by other witnesses describing a deterioration in defendant's physical appearance and changes in defendant's sexual attitudes following his brain surgery falls short of showing the impaired capacity mitigating circumstance; and testimony by the sheriff tended to show that defendant was able to conform his conduct to the requirements of the law while in jail and when being transferred to and from various court proceedings.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**26. Criminal Law § 732 (NCI4th) — capital sentencing — instructions — use of "tending to show"**

The trial court's use of the phrase "tending to show" in reviewing the evidence in a capital sentencing proceeding did not constitute an expression of judicial opinion on the evidence.

**Am Jur 2d, Trial §§ 527 et seq.**

27. **Criminal Law § 1347 (NCI4th) — capital sentencing — crimes against another victim — consideration**

    The trial court did not err in allowing the jury in a capital sentencing proceeding to consider defendant's crimes against another victim on the issues of "plan," "scheme," and "motive" since (1) the course of conduct aggravating circumstance submitted to the jury is proved by showing that a "plan" or "scheme" existed in the mind of the defendant involving both the murder and other crimes of violence; and (2) similarity of motive is relevant to determining the existence of the course of conduct circumstance.

    **Am Jur 2d, Criminal Law §§ 527 et seq.**

28. **Criminal Law § 1344 (NCI4th) — capital sentencing — heinous, atrocious, or cruel aggravating circumstance — supporting evidence**

    The evidence in a capital sentencing proceeding supported the trial court's submission of the "especially heinous, atrocious, or cruel" aggravating circumstance where it tended to show that the victim was kidnapped at gunpoint, stripped naked, and driven to another location where she was forced to walk or run to the place where she was beaten on the head, kicked in the throat, and strangled by the defendant, and that defendant told a witness that the victim died a slow and painful death.

    **Am Jur 2d, Criminal Law §§ 527 et seq.**

29. **Criminal Law § 629 (NCI4th) — capital sentencing — statement by defendant — corpus delicti rule inapplicable**

    The *corpus delicti* rule for confessions did not apply in a capital sentencing proceeding to render inadmissible defendant's uncorroborated statement to a witness that the victim had died a slow and painful death where defendant's plea of guilty to first-degree murder established that a crime had been committed.

    **Am Jur 2d, Criminal Law §§ 527 et seq.; Evidence §§ 530, 1142.**

30. **Criminal Law § 1343 (NCI4th) — capital sentencing—heinous, atrocious, or cruel aggravating circumstance—instruction not unconstitutionally vague**

The trial court's instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance in a capital sentencing proceeding was not unconstitutionally vague.

**Am Jur 2d, Criminal Law §§ 527 et seq.**

31. **Criminal Law § 1325 (NCI4th) — capital sentencing—mitigating circumstances—instructions comporting with McKoy decision**

The trial court's pattern capital sentencing instructions which informed the jury in Issue Three that it *must* weigh any mitigating circumstances it found to exist against the aggravating circumstances and that each juror "may" consider any mitigating circumstance or circumstances that he or she determined to exist by a preponderance of the evidence did not allow jurors to disregard properly found mitigating circumstances and fully comported with *McKoy v. North Carolina*, 494 U.S. 433. Furthermore, each juror was not required by *McKoy* to consider, at Issue Three and Issue Four, mitigating circumstances which he or she did not find but which were found by one or more other jurors.

**Am Jur 2d, Trial § 1760.**

32. **Criminal Law § 1357 (NCI4th) — capital sentencing—mitigating circumstances—mental defect—refusal to submit—subsumption by other circumstances found by jury**

The trial court did not err by refusing to submit as a nonstatutory mitigating circumstance in a capital sentencing proceeding that defendant's inability to "conform his conduct to the requirements of the law was by reason of his mental defect and not of his own making" where this circumstance was subsumed by the statutory "impaired capacity" and "mental or emotional disturbance" mitigating circumstances found by the jury and by the nonstatutory mitigating circumstance found by the jury that "defendant did not himself know or fully appreciate his mental condition and dangerousness at the time of the murder, or . . . he had not been warned that his mental condition might lead to an inability to control his conduct or to conform it to the requirements of the law."

**Am Jur 2d, Trial § 1760.**

**33. Criminal Law § 1323 (NCI4th)— capital sentencing — instructions — definitions of aggravating and mitigating circumstances**

The trial court did not err by refusing to give defendant's requested instruction in a capital sentencing proceeding that aggravating circumstances are those "that tend to make a specific defendant particularly appropriate for the most serious and final punishment prescribed by law" and by instructing that "an aggravating circumstance is a fact or group of facts which tend to make a specific murder particularly deserving of the maximum punishment prescribed by law." Nor did the court err by instructing that "a mitigating circumstance . . . is a fact or group of facts which . . . may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first degree murders."

**Am Jur 2d, Trial § 1760.**

**34. Criminal Law § 1328 (NCI4th)— capital sentencing — instruction on cruel or unusual punishment not proper**

The trial court did not err by refusing to charge the jury in a capital sentencing proceeding that it should return a recommendation of life imprisonment if it determined, in light of the defendant's individual circumstances, that the punishment of death would be cruel or unusual since the determination of whether a sentence constitutes cruel or unusual punishment is a question of law and not a question for the jury, and North Carolina's capital sentencing scheme does not violate the constitutional prohibition against cruel or unusual punishments.

**Am Jur 2d, Criminal Law §§ 527 et seq.**

**35. Criminal Law § 824 (NCI4th)— instruction defining expert**

The trial court did not commit plain error by instructing the jury that an expert is one who "purports to have specialized skill or knowledge."

**Am Jur 2d, Trial §§ 1237-1241.**

**36. Criminal Law § 496 (NCI4th) — capital sentencing — denial of jury's request for expert testimony — proper exercise of discretion**

The trial court did not abuse its discretion by denying the jury's request in a capital sentencing proceeding to have a copy of the testimony of two expert witnesses where it is clear from the record that the trial court was aware of its discretionary authority to allow the jury to review the experts' testimony and that the court's decision was made to conserve time and to ensure that all evidence received equal consideration. N.C.G.S. § 15A-1233(a).

**Am Jur 2d, Criminal Law §§ 527 et seq.**

**37. Criminal Law § 109 (NCI4th) — capital sentencing — defendant's psychologist — preparation of report for State**

The trial court did not err by requiring a psychologist who testified as an expert for defendant in a capital sentencing proceeding to prepare and furnish to the State a written report of his examination of defendant since it is within the purview of N.C.G.S. § 15A-905(b) that the State be provided in advance of a mental expert's testimony with a meaningful report which the State can use in preparation for trial.

**Am Jur 2d, Depositions and Discovery § 449.**

**38. Criminal Law § 1329 (NCI4th) — capital sentencing — denial of jury poll on mitigating circumstances**

The trial court did not err in the denial of defendant's request that the jurors in a capital sentencing proceeding be polled as to how they individually answered each of the proffered mitigating circumstances since N.C.G.S. § 15A-2000(b) only contemplates polling the jurors regarding their final recommendation, and nothing in the statute indicates that jurors should be polled as to their individual answers to the various issues addressed during sentencing deliberations.

**Am Jur 2d, Trial §§ 1763, 1772.**

**39. Criminal Law § 1363 (NCI4th) — capital sentencing — nonstatutory mitigating circumstances — supporting evidence — jury's failure to find mitigating value**

Although there was supporting evidence in a capital sentencing proceeding for submitted nonstatutory mitigating cir-

STATE v. LEE

[335 N.C. 244 (1994)]

cumstances that defendant had entered pleas of guilty to every crime he was accused of committing, he had a good work history, and he had adjusted well to incarceration and would be of benefit to society if sentenced to life imprisonment, these circumstances do not have mitigating value as a matter of law, and the jury's failure to find that these circumstances have mitigating value does not require that defendant's sentence of death be set aside.

**Am Jur 2d, Trial § 1760.**

**40. Criminal Law § 1373 (NCI4th) — first-degree murder — death sentence not disproportionate**

A sentence of death imposed upon defendant was neither excessive nor disproportionate to the penalty imposed in the pool of similar cases considering both the crime and the defendant where the record clearly supported the jury's findings of the aggravating circumstances that the murder was committed in the course of a kidnapping, was especially heinous, atrocious, or cruel, and was a part of a course of conduct involving crimes against another person; pertinent traits of the defendant were his law abiding history, his mental or emotional disturbance, and his lack of capacity to conform his conduct to the law; defendant's conviction was based on the theory of premeditation and deliberation; defendant methodically sought out Appalachian State University female students as they exercised on the streets of Boone; defendant kidnapped the victim with the intent to sexually assault and murder her; defendant perpetrated unnatural and violent sexual acts upon the victim; the crimes defendant committed against the victim occurred over a period of several hours; and the victim experienced extreme psychological and physical torture during this time.

**Am Jur 2d, Criminal Law § 628.**

Justices WHICHARD and PARKER did not participate in the consideration or decision of this case.

Justice FRYE dissenting.

Chief Justice EXUM joins in this dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Lamm, J., at the 26 April 1990 Criminal Session of Superior Court, Avery County, upon a sentence recommendation by the jury after the defendant pled guilty to first degree murder. Heard in the Supreme Court 13 November 1991.

The defendant pled guilty to first degree murder and a sentencing hearing was held. The State's evidence tended to show that on 24 September 1989, the defendant kidnapped, sexually assaulted, and murdered the victim, Jennifer Gray. The defendant left the victim's body on a logging road in a remote area of Watauga County. On 29 September 1989, the defendant kidnapped, raped, sodomized and robbed Leigh Cooper. Ms. Cooper managed to escape and to supply law enforcement authorities with the information which led to the defendant's arrest. On 10 October 1989, the Watauga County Grand Jury returned true bills of indictment charging the defendant with the first degree murder of Ms. Gray, first degree kidnapping of Ms. Gray, and first degree sexual offense against Ms. Gray. The grand jury also returned a multi-count true bill of indictment charging the defendant with committing numerous felonies against Ms. Cooper.

Upon the motion of the defendant, venue was changed to Avery County due to extensive pretrial publicity. On 16 April 1990, prior to the commencement of jury selection in this case, the defendant entered pleas of guilty to first degree murder and first degree kidnapping. A capital sentencing proceeding was commenced in the murder case on 16 April 1990. The State presented evidence of, and the jury found, the aggravating circumstances that the murder was especially heinous, atrocious, or cruel, was committed while defendant was engaged in a kidnapping, and was part of a course of conduct in which defendant engaged and which included crimes of violence by the defendant against another person. N.C.G.S. § 15A-2000(5), (9), (11) (1988).

The defendant's penalty phase evidence tended to show that at the time of the murder he was twenty-three years old. In May of 1988, the defendant was struck on the head with a tree limb while on an outing in the country with his girlfriend. That night, the defendant began to suffer from head pain and loss of physical function. He was taken to a hospital emergency room where the attending physician found the defendant to be suffering from severe

STATE v. LEE

[335 N.C. 244 (1994)]

frontal headaches, confusion, loss of consciousness, loss of bowel function and vomiting. Further examination by physicians at North Carolina Baptist Hospital in Winston-Salem revealed that the defendant was suffering from a life threatening aneurysm deep inside his brain.

Following surgery to repair the aneurysm, the defendant remained hospitalized for several weeks before returning home for further recuperation. Numerous witnesses, including the defendant's father and former girlfriend, testified that the defendant's behavior underwent extreme changes following the surgery. The defendant was described as having changed from being a polite, non-violent, considerate, and clean young man to one who was unclean, lethargic, and unreliable. The defendant's girlfriend testified that the defendant's sexual behavior changed from being gentle and considerate to perverse and demanding.

Two expert witnesses testified that the defendant's brain aneurysm and ensuing surgery had resulted in permanent brain damage which caused the defendant to suffer from behavioral and emotional abnormalities. Dr. Sciara, a neuropsychologist, testified that the defendant's decreased hygiene, decreased ambition, changed and unusual sexual behavior, and lack of consideration for others, was consistent with the defendant's type of brain damage.

Based on this evidence, the jury found five mitigating circumstances related to the defendant's mental and emotional disturbance and his non-violent and law abiding history. Nevertheless, the jury found that the mitigating circumstances did not outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to warrant imposition of the death penalty. Based on these findings, the jury returned a recommendation of death. The trial court sentenced the defendant to death in accordance with this recommendation. The defendant appeals.

*Lacy H. Thornburg, Attorney General, by Joan Herre Byers, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, and Jeffery M. Hedrick, for defendant appellant.*

WEBB, Justice.

[1]   Prior to trial, the defendant made an *ex parte* application for the appointment of a psychiatric expert. The trial court granted the defendant's motion and ordered that certain funds be made available to the defendant for the employment of a mental health expert. The defendant contends that the trial court erroneously ordered, as a pre-condition to employing an expert, that the expert provide the State with a report of his evaluation of the defendant. We disagree.

The record reveals that the court's provision of funds to hire an expert was unconditional. After stating that he would order that funds be made available to the defendant, the judge said:

> I would also propose to provide in this Order, I'll hear any objections either of you may have, that after you receive whatever reports you receive, if you intend to use any of these experts as a witness, that you at that time give the State notice, and comply with the rules of discovery with regard to that[.]

N.C.G.S. § 15A-905, which governs the State's right of pretrial discovery in criminal cases, provides that the State is entitled to:

> results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case . . . which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, when the results or reports relate to his testimony.

N.C.G.S. § 15A-905(b) (1988).

Thus, the record clearly shows that the court simply informed the defendant of the State's discovery rights which would arise if the defendant intended to call the expert as a witness at trial. Because the record clearly shows that the trial court imposed no conditions on the defendant's employment of an expert, this assignment of error is overruled.

## Jury Selection

[2]   By his next assignment of error, the defendant contends that the trial court violated his state and federal constitutional rights by excusing prospective jurors, and conducting private

STATE v. LEE

[335 N.C. 244 (1994)]

unrecorded bench conferences, outside of his presence. N.C. Const. art. I, § 23. When a trial court conducts private unrecorded conferences with prospective jurors, the trial court commits reversible error unless the State can show that the error was harmless beyond a reasonable doubt. *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990); *State v. Payne*, 328 N.C. 377, 402 S.E.2d 582 (1991); *State v. Hudson*, 331 N.C. 122, 415 S.E.2d 732 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 136 (1993). The State may show that the error was harmless beyond a reasonable doubt where the transcript reveals the substance of the trial court's conversation with the juror, or where the trial judge reconstructs the substance of the conversation on the record. *Id.*

[3] In the instant case, the defendant contends that prospective jurors Gragg, Holtzclaw and Dugger were excused outside his presence and that he was not present during a private conversation between the trial court and juror Hughes. The record shows that at the commencement of jury selection, the following transpired when the judge instructed the clerk to place twelve jurors in the jury box.

CLERK: Leonard Fisher, please take the back row seat in the corner, in the orange seat. Sherrill Johnson; Ronda Tatum; Roma Gragg, Your Honor I think that's one you excused—

THE COURT: Yes, sir, I have excused her for medical reasons.

Later during jury selection, the trial court instructed the clerk to call three more prospective jurors to the jury box. At that point the following transpired.

CLERK: Karen Holtzclaw take seat number one.

CLERK TAYLOR: Your Honor, she's the one that called this morning and said she had the flu.

THE COURT: Okay, lay her aside.

These recorded exchanges show that jurors Gragg and Holtzclaw sought, by private communication with the trial court, excusal from jury service. These exchanges reveal the substance of the communication between the court and the jurors. The trial court stated that juror Gragg was being excused for medical reasons and that juror Holtzclaw had informed the court, through Clerk Taylor, that she had the flu and that the court, therefore, excused her from service.

The record on appeal, by stipulation of the parties, includes the affidavits of Clerk Taylor and juror Gragg which purport to describe the substance of the communications which led to the excusals of jurors Gragg and Holtzclaw. Although these affidavits are unnecessary to show the substance of the communications, they do confirm that juror Gragg was excused due to her mother's illness and impending surgery and that juror Holtzclaw was excused due to her own illness. These are proper grounds for the excusal of jurors. Thus, we hold that the defendant's absence from the trial court's communications with these jurors was harmless beyond a reasonable doubt.

[4] The defendant next contends that his constitutional rights were violated by the excusal of juror Dugger following an unrecorded bench conference. The record shows that during the State's *voir dire* examination of Mr. Dugger, he stated that he had been charged with a criminal offense in 1972 and that his son had been murdered in 1985. The State passed Mr. Dugger to the defense whereupon defense counsel requested to approach the bench. An unrecorded bench conference ensued during which all counsel were present. During this conference, the trial court asked Mr. Dugger to approach the bench and the conference continued. At the conclusion of the bench conference, defense counsel excused Mr. Dugger. The defendant now says that the excusal of this juror following the unrecorded bench conference, with all counsel present, violated his constitutional right to be present at all stages of his capital trial. We do not agree.

The record clearly reflects that the subject of the bench conference was the possibility of partiality on the part of Mr. Dugger. Furthermore, the trial judge's unrecorded communication with Mr. Dugger was not the type of cloistered conversation resulting in the juror's excusal by the trial judge that this Court has previously found to require a new trial. *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362; *State v. McCarver*, 329 N.C. 259, 404 S.E.2d 821 (1991). Rather, both defense counsel were present at the conference and free to keep the defendant apprised of everything that transpired during the conference. Likewise, the defendant was actually present in the courtroom during the conference, was able to observe the context in which it arose, and remained free to inquire of his attorneys regarding its substance. Perhaps most significantly, defense counsel, not the trial judge, excused Mr. Dugger. For the foregoing reasons, this assignment of error is overruled.

STATE v. LEE

[335 N.C. 244 (1994)]

[5] Finally, the defendant says the trial court committed reversible error by engaging in an unrecorded conversation with juror Hughes outside of the defendant's presence. The record reveals that during the course of the sentencing proceeding the trial court stated:

> THE COURT: Gentlemen, before we begin with the evidence this morning, and in the absence of the jurors I mentioned to you what Ms. Hughes, juror number ten had related to me Friday afternoon after they were discharged. So, for the record I'm going to bring her out and ask her a few questions and then give each of you gentlemen the opportunity to ask her any questions that you wish.

The trial court then inquired of the juror as to whether her acquaintance with the defendant's sister, a defense witness, would in any way affect her ability to be fair and impartial. The State conducted a similar examination of the juror. However, the defendant elected not to question juror Hughes and she remained on the jury without objection.

This record sufficiently reveals that the substance of the trial court's *ex parte* communication with Ms. Hughes concerned her acquaintance with the defendant's sister and her desire to bring that fact to the court's attention. Therefore, we hold that the court's unrecorded *ex parte* conversation with Ms. Hughes was harmless beyond a reasonable doubt.

[6] By his next assignment of error, the defendant contends the trial court erred by conducting bench conferences outside his presence. In *State v. Buchanan*, 330 N.C. 202, 410 S.E.2d 832 (1991), we addressed the identical question. In *Buchanan*, we held that, generally, a defendant's right to be present is not violated if defense counsel is present at the bench conference and the defendant is actually in the courtroom. However, we further held in *Buchanan*, that if the subject matter of the conference implicates the defendant's confrontation rights, or is of the nature that the defendant's presence would have a reasonably substantial relation to the defendant's opportunity to defend, the defendant's constitutional rights are violated if he is not present. *State v. Buchanan*, 330 N.C. at 223-224, 410 S.E.2d at 845. The burden is on the defendant to show the usefulness of his presence at the unrecorded bench conference. *Id.* We must therefore determine whether the defendant has met his burden of showing the usefulness of his presence.

STATE v. LEE

[335 N.C. 244 (1994)]

There were thirty-nine unrecorded conferences with trial counsel. However, the record is sufficient to allow this Court to discern the substance of the majority of these conferences. The record shows, and the defendant concedes, that the majority of the bench conferences concerned questions of law or logistical matters, such as the scheduling of recesses or preparation for a witness' testimony. The defendant does not suggest, and we cannot determine, how his presence at these conferences would have served any useful purpose.

Although the record is silent as to the substance of the remainder of the conferences, it shows that defense counsel was present at each of these conferences and that the defendant was actually in the courtroom. The record also shows that nothing occurred, either procedurally or substantively, as a result of these conferences. Following each conference, the proceedings continued in ordinary fashion. Importantly, defense counsel did not object to anything that occurred during any of these unrecorded conferences. For these reasons, we hold that the defendant has failed to meet his burden of showing how he was prejudiced by his absence from these conferences. This assignment of error is overruled.

[7] By his next assignment of error, the defendant contends that the trial court erred by denying his pretrial motion to record all bench conferences. The defendant contends that this ruling violated N.C.G.S. § 15A-1241(a), which requires that an "accurate record of all statements from the bench and all other proceedings" be kept by the court reporter.

In *State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692 (1992), we held that the Legislature, by enactment of this statute, did not intend to disturb the time-honored practice of off-the-record bench conferences between trial judges and attorneys, but that it was intended to allow appellate review of statements made within earshot of jurors or others present in the courtroom. *State v. Cummings*, 332 N.C. at 498, 422 S.E.2d at 698. Therefore, the trial court's refusal to require recordation of private bench conferences was not erroneous.

However, a defendant is not precluded from having the record reflect the substance of private bench conferences. As we held in *Cummings*, when a party "requests that the subject matter of a private bench conference be put on the record for possible appellate review, the trial judge should comply by reconstructing,

as accurately as possible, the matter discussed." *Id.* at 498, 422 S.E.2d at 698.

In this case, defense counsel was present at each of the unrecorded conferences, none of the conferences resulted in any significant ruling, and most dealt with purely logistical matters. Most importantly, the record is devoid of any objection by defense counsel. In the event that anything prejudicial to the defendant occurred during these bench conferences, it was the duty of defense counsel, who were aware that the conferences were not being recorded, to have the record reflect the substance of the prejudicial matter. Therefore, even if the denial of the defendant's motion was erroneous, which it was not, the error was harmless. We overrule this assignment of error.

[8] The defendant next assigns error to the court's denial of his request that the court give an instruction during the jury selection defining life imprisonment "to be just that: life imprisonment" and the refusal of the court to give a similar instruction during the jury deliberations. During its deliberations, the jury sent a note to the court asking whether the defendant could ever be eligible for parole from the sentences imposed for the crimes against Leigh Cooper. The Court, pursuant to *State v. Conner*, 241 N.C. 468, 85 S.E.2d 584 (1955), instructed the jury that they should not consider eligibility for parole in reaching a verdict but should determine the question as though life means imprisonment for life. The court instructed the jury to decide the case "wholly uninfluenced by consideration of what another arm of the government might or might not do in the future."

The defendant concedes that the instructions given by the court are correct under our cases. *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909 (1989), *sentence vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756 (1990); *State v. Robbins*, 319 N.C. 465, 356 S.E.2d 279, *cert. denied*, 484 U.S. 316, 98 L. Ed. 2d 226 (1987). He says that ordinarily these instructions would be sound if we assume the jury knows nothing of parole and considers a life sentence to mean life in prison. In this case, however, he says the jury knew of the possibility of parole and it was error not to inform them that the defendant would not be eligible for parole for eighty years.

We find no error in this charge which has been approved in many cases. We will assume the jury followed the court's in-

struction and did not consider the possibility of parole in reaching its decision. This assignment of error is overruled.

**[9]** The defendant next assigns error to the trial court's refusal to allow individual *voir dire* of prospective jurors. The defendant says the trial court abused its discretion in refusing his request and thereby denied him his constitutional right to due process of law. The defendant argues that because there was extensive pretrial publicity about this case, as well as the cases involving Ms. Cooper, individual *voir dire* was necessary to enable him to examine adequately the jurors about their exposure to the pretrial publicity without tainting the remainder of the jury pool.

A trial judge may, in his discretion and for good cause shown, order that jurors be selected one at a time. *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); N.C.G.S. § 15A-1414(j) (1988). An abuse of discretion is shown only where the court's ruling "was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986); *See also State v. Barts*, 316 N.C. 666, 343 S.E.2d 828 (1986).

In denying defendant's motion, the trial judge indicated that if, during the sentencing proceeding, a matter were to arise which would require "individual attention in order to have a fair selection process," he would consider allowing individual *voir dire* at that time. The judge also indicated that this ruling was based, at least in part, on his desire to avoid an unnecessarily lengthy jury selection process. We hold that the record shows that the judge's ruling was a reasoned decision by which he attempted to conserve judicial resources without foreclosing the possibility of allowing individual *voir dire* if it became necessary to ensure a fair jury selection process.

However, even if we assume it was error to deny the defendant's motion, the record shows that the defendant was not prevented from making any relevant inquiry necessary to determine whether prospective jurors had been exposed to pretrial publicity and, if so, whether that exposure affected their impartiality. During jury selection, prospective jurors were examined with regard to their exposure to pretrial publicity about the case. Those jurors who stated that they had heard about the case through the media were then asked whether they had formed an opinion as to the ap-

propriate punishment for the defendant. Those jurors who had formed such an opinion were successfully challenged for cause. Of the jurors who were selected, four had not heard about the case prior to the hearing. The remainder of the jurors who were selected stated that although they had previously heard about the case, they had not formed opinions as to the appropriate punishment and would be able to give equal consideration to the State's and the defendant's evidence. Therefore, any error by the trial court in denying the defendant's motion for individual *voir dire* was harmless. This assignment of error is overruled.

By his next assignments of error, the defendant contends that the trial court erred by unduly restricting *voir dire* of prospective jurors regarding their understanding as to the meaning of "life imprisonment," their attitudes toward the death penalty, their belief in the jury system, and whether they would hold it against the defendant if he chose not to testify.

A trial judge has broad discretion to regulate jury *voir dire*. *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990); *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986). In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby. *Id.*

[10] As we held above, the subject of parole eligibility and the meaning of "life imprisonment" are irrelevant to the issues to be determined during the sentencing proceeding. *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 279. The trial court did not abuse its discretion by refusing to allow the defendant to question jurors regarding these subjects.

[11] Nor did the court err by refusing to allow the defendant to ask certain questions regarding juror attitudes and beliefs about the death penalty. The defendant sought to ask the jurors whether they believed in the death penalty, why they held those beliefs, whether they believed the death penalty has a deterrent effect, whether they believed human life is sacred, and whether they believed the death penalty should be reserved for the worst cases.

The record shows that all jurors who were eventually selected stated they had formed no opinion as to the appropriateness of the death penalty in this case. The jurors related that they would

STATE v. LEE

[335 N.C. 244 (1994)]

be able to follow the law and that they would consider the defendant's evidence with impartiality. The defendant was permitted to ask how frequently the jurors thought about and discussed the death penalty. The defendant was not prevented from asking whether the jurors believed that life imprisonment may be an appropriate sentence in some first degree murder cases, or whether they believed that the death penalty was appropriate in all such cases. *State v. Quick*, 329 N.C. 1, 405 S.E.2d 179 (1991).

The defendant was entitled to determine, by way of *voir dire*, whether the prospective jurors were predisposed to return a recommendation of death, and whether they would follow the law and equally consider the evidence in mitigation and aggravation. *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 684, *rehearing denied*, --- U.S. ---, 123 L. Ed. 2d 503 (1993). Because we believe that the defendant was allowed adequate latitude to assess juror attitudes toward the death penalty, we find no abuse of discretion by the court.

The defendant next contends he was prejudiced by the court's refusal to allow him to ask the jurors whether they believed in the jury system, whether they understood and believed in the principles of law that were to be applied, whether they understood the consequences of their potential decision and whether they would stand by their convictions during deliberations. For the following reasons, we disagree with this contention.

[12] The juror whom the defendant sought to ask whether she believed in and understood the applicable principles of law was successfully challenged for cause by the State. Therefore, defendant has failed to show how he was prejudiced by the court's refusal to allow him to ask the question. Nor was defendant prejudiced by the court's refusal to allow him to ask a juror whether the juror believed in the jury system. The record shows that immediately after the question was asked, the judge gave a short explanation of the jury's role in a capital sentencing proceeding and then asked all the jurors in the jury box whether any of them disagreed with the jury's role as he had explained it. No juror indicated any disagreement. Because defendant received answers to the question he was prevented from asking, defendant suffered no prejudice.

Contrary to defendant's contentions, the court did not prevent him from asking whether the jurors understood the consequences of their potential decision. Rather, the court sustained the State's

objection to defendant's characterization of a particular statute as a "good law." This objection was properly sustained.

[13]    Finally, the defendant says it was error not to let him ask the jurors whether they would hold it against him if he did not testify. Immediately after sustaining the State's objection to this question, the court instructed the jury as to the defendant's right not to testify and inquired as to whether they disagreed with this principle of law. This cured any error which may have occurred in sustaining the objection to the defendant's question.

## Sentencing Proceeding

[14]    The defendant next assigns as error the trial court's exclusion of two photographs of the defendant from the evidence. One photograph purported to depict the defendant as a child. The other purported to depict the defendant as a high school senior. The defendant says that it was error to exclude these photographs while allowing the State to introduce a photograph of the defendant taken at the time of his arrest. We disagree.

In order for a photograph to be introduced, it must first be properly authenticated by a witness with knowledge that the evidence is in fact what it purports to be. N.C.G.S. § 8C-1, Rule 901(a) (1992). A photograph is admissible if it can be properly authenticated as a correct portrayal of the person depicted. *State v. Young*, 291 N.C. 562, 231 S.E.2d 577 (1977). The record reveals that the witness through whom the defendant sought to introduce the photographs did not know the defendant at the times the photographs were taken. A witness who did not know the defendant at the time the photographs were taken could not testify that the photographs accurately portrayed the defendant's appearance at the relevant times. This assignment of error is overruled.

Next, the defendant contends that errors were committed during cross-examination of Anthony Sciara, a neuropsychologist who testified as an expert for the defendant. During the prosecution's cross-examination of Dr. Sciara, the following exchange occurred.

Q: Now Doctor, the brain damage was in the motor skills areas of his brain, is it not, sir?

A: No, not exactly.

Q: You would disagree with your predecessor on the witness stand, you heard his testimony?

A: I heard his testimony, but that's not what he said.

Q: All right. Doctor—

A: That was—let me explain that because I think it's important.

THE COURT: Well, the jury has heard his testimony too, it's for them to decide what his testimony is, not for you to explain it to them, what somebody else's testimony was, Doctor.

A: Yes, sir.

[15] The defendant first argues that the prosecutor's cross-examination improperly inferred that the testimony of the defendant's two experts was contradictory. The defendant says that the prosecutor's cross-examination was improper because it amounted to an expression of his personal opinions and beliefs about the witnesses' testimony. We disagree.

Counsel is allowed great latitude on cross-examination to test matters related by a witness on direct examination. *State v. Burgin*, 313 N.C. 404, 329 S.E.2d 653 (1985); *State v. Garner*, 330 N.C. 273, 410 S.E.2d 861 (1991). The control of cross-examination is left to the sound discretion of the trial court and its rulings thereon will not be disturbed absent a showing of abuse of discretion. *State v. Hinson*, 310 N.C. 245, 311 S.E.2d 256, *cert. denied*, 469 U.S. 839, 83 L. Ed. 2d 78 (1984). Cross-examination of a witness as to any matter relevant to any issue, including credibility, is proper. N.C.G.S. § 8C-1, Rule 611(b) (1992); *State v. McAvoy*, 331 N.C. 583, 417 S.E.2d 489 (1992).

Dr. Lindley, the neurosurgeon who testified prior to Dr. Sciara, described the injury to the defendant's brain. On direct examination, Dr. Lindley testified that the defendant's brain damage was due to a brain aneurysm and that the damage was located in an area of the brain related to motor skill functions. He further testified that brain damage like the defendant's did "[n]ot classically" affect behavior, but that there is "some behavioral function" ascribed to the area of the defendant's brain that was damaged. The nature of the brain damage suffered by the defendant was uncommon and may have affected the limbic system. Damage to the limbic system tends "to change things such as behavior[.]" With brain damage like the defendant's, there "is the potential for some drastic

behavior changes." Nevertheless, on cross-examination, Dr. Lindley repeatedly testified that he could only hypothesize that the defendant's brain damage caused changes in his personality and behavior. Dr. Lindley testified that he relies on persons with expertise in the field of neuropsychology to make such determinations.

Dr. Sciara, the neuropsychologist, testified that the defendant "has suffered brain damage and that that brain damage is in an area of the brain that deals with control, with sexuality, with aggressiveness, so all of those findings would be consistent with his behavior." Dr. Sciara further described in detail how the defendant's brain damage could have caused the behavioral changes that resulted in the defendant committing the crimes with which he had been charged.

We believe the prosecutor's cross-examination of Dr. Sciara was for the purpose of determining whether his testimony was consistent with the testimony of Dr. Lindley. If, by asking Dr. Sciara whether he disagreed with Dr. Lindley, the prosecutor inferred that the expert's testimony was contradictory, the inference was not improper. Dr. Lindley testified that the brain damage suffered by the defendant was located in an area of the brain that is related to motor skill functions and he could only hypothesize that the damage affected the defendant's behavior. On the other hand, Dr. Sciara's testimony was definite with regard to the defendant's brain damage having affected his behavior.

Moreover, we do not believe that by asking Dr. Sciara whether he disagreed with the testimony given by Dr. Lindley, the prosecutor was expressing his personal opinion about the evidence. Rather, the prosecutor was attempting to determine whether the two witnesses' testimony was consistent. If the experts' testimony was inconsistent, it would also tend to be less credible. Because witness credibility is a proper and relevant matter for cross-examination, *State v. McAvoy*, we find no abuse of discretion by the trial judge in his control of cross-examination.

[16] The defendant next says that the trial court erred by intervening *ex mero motu* during cross-examination to prevent Dr. Sciara from explaining that his testimony was consistent with the earlier testimony of Dr. Lindley. This contention has merit.

The State contends that any attempt by Dr. Sciara to testify concerning the evidence given by Dr. Lindley would have been

hearsay not within an exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 801(c) defines hearsay as a statement "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In the instant case, any testimony by Dr. Sciara concerning the testimony of Dr. Lindley would not have been offered for the truth of the matter asserted. Rather, such testimony would have been offered for the purpose of explaining that his testimony did not conflict with Dr. Lindley's testimony. We hold it was error for the trial court to refuse to allow Dr. Sciara to attempt to resolve any of the apparent conflicts between his and Dr. Lindley's testimony.

We must now determine whether the trial court's error was prejudicial to the defendant. The error at issue involved a ruling on the evidence and did not implicate a right arising under the federal or state Constitution. Therefore, the test is whether there is a reasonable possibility that had the error not occurred, a different result would have been reached at the trial. N.C.G.S. § 15A-1443(a) (1988); State v. Milby, 302 N.C. 137, 273 S.E.2d 716 (1981). The defendant bears the burden of showing that such a reasonable possibility exists. State v. Gibson, 333 N.C. 29, 424 S.E.2d 95 (1992). For the following reasons, we hold that the defendant has failed to carry his burden.

As we have said, the effect of the trial court's ruling was to prevent Dr. Sciara from explaining that his testimony was consistent with Dr. Lindley's testimony. Therefore, if it would have been apparent to the jury that the witnesses' testimony was actually consistent, there would be no reasonable possibility that the trial court's ruling affected the result of the defendant's trial. Our review of the record shows that the experts' testimony was overall consistent and that this general consistency must have been apparent to the jury.

On direct examination, Dr. Lindley testified concerning the injury and damage to the defendant's brain that was caused by the aneurysm. He described what an aneurysm is, where the defendant's aneurysm was located, and what parts of the defendant's brain were affected. Dr. Lindley further described the surgical procedure which was used to treat the defendant's condition and how the defendant suffered a certain amount of brain damage as a result of the surgical procedure.

Dr. Lindley conducted a post-surgery, mental status examination of the defendant which revealed that the defendant was unconcerned about the criminal charges pending against him; that his effect was flat. The area of the defendant's brain that was damaged classically affects movement. However, the defendant's brain damage was in many ways unique and may well have affected his personality and behavior. Nevertheless, Dr. Lindley could not render an expert opinion as to whether the defendant's brain damage caused behavioral changes because such diagnoses are ordinarily left to persons with expertise in the fields of neuropsychology and neuropsychiatry.

Dr. Sciara, an expert in the field of neuropsychology, testified regarding the defendant's behavioral changes. He testified that the defendant suffered damage in the frontal lobe and old brain portions of his brain. Dr. Sciara opined that damage to these portions of the defendant's brain caused behavioral changes in the defendant and contributed to his committing the crimes with which he had been charged. This opinion was based on the doctor's review of the defendant's hospital records, research, and interviews with persons closely associated with the defendant prior to and after his brain injury.

Although the testimony of the defendant's expert witnesses was not entirely congruous, it was at the very least complementary. The surgeon's expertise was in identifying those portions of the defendant's brain that were damaged and the psychologist's expertise was in identifying the behavioral manifestations of those injuries. We do not believe that there is any reasonable possibility that the jury could have found the expert's testimony to have been contradictory, or that it would have accepted any such inference.

In addition, the defendant failed to make an offer of proof as to what Dr. Sciara's testimony would have been had the trial court not improperly intervened. While we agree with the defendant that it is apparent from the context that Dr. Sciara would have attempted to explain any inconsistencies in the evidence, the record fails to reveal exactly how he would have done so. Therefore, we hold that there is no reasonable possibility that if the error had not occurred, a different result would have been reached at the trial.

[17] Under his next assignment of error, the defendant contends that the trial court erred by allowing the State to ask Dr. Lindley

whether it was possible that the defendant's "flat effect" could have been caused by the defendant's prolonged use of marijuana or alcohol or a combination of the two. The defendant says that this question was improper because it was irrelevant to the defendant's state of mind at the time of the killing. The defendant also says that there was no evidence of prolonged drug use by the defendant. This argument is meritless.

A witness may be cross-examined on any matter relevant to any issue including credibility. N.C.G.S. § 8C-1, Rule 611(b) (1992); *State v. Freeman*, 319 N.C. 609, 356 S.E.2d 765 (1987). In this case, the defendant's mental and emotional condition at the time of the murder was a significant issue. Dr. Lindley testified on direct examination that he found the defendant to exhibit little concern over the criminal charges that he was facing and that he did not appear to be emotionally affected by those charges. There was also evidence the defendant was a user of marijuana and alcohol prior to and until the date of his arrest. Whether the defendant's flat emotional state was the result of drug use, or as the defendant contended, the result of a brain aneurysm and subsequent surgery, was a proper subject of inquiry.

[18] By his next assignment of error, the defendant contends that Ms. Leigh Cooper was erroneously allowed to testify concerning the defendant's crimes against her. Specifically, the defendant says that this evidence did not show a "course of conduct," N.C.G.S. § 15A-2000(e)(11), was inadmissible character evidence, and that even if the evidence was admissible for the limited purposes described in N.C.G.S. § 8C-1, Rule 404(b), its probative value was outweighed by the danger of undue prejudice. N.C.G.S. § 8C-1, Rule 403 (1992).

The State's evidence in this case tended to show that on 24 September, the defendant kidnapped Ms. Gray as she was exercising on the streets of Boone, North Carolina. The defendant believed that Ms. Gray was a student at Appalachian State University. The defendant drove her into the mountainous countryside where he sexually assaulted her and then strangled her to death. Ms. Gray's underpants and watch, which she was shown to have been wearing at the time of her disappearance, were never recovered although the remainder of her clothing was found.

Ms. Cooper testified that five days after the disappearance of Ms. Gray, in the late afternoon of 29 September, she was jogging along a street in Boone when the defendant, driving his car, blocked

her path, pointed a pistol at her and ordered her into his car. As the defendant drove Ms. Cooper away from town, he asked her name, how old she was and whether she was a student at the university. The defendant then ordered her to remove her clothes and to begin performing oral sex on the defendant. The defendant stated that he intended to keep her brassiere and underpants. Upon arrival in an isolated area, the defendant repeatedly raped and sodomized Ms. Cooper.

During the course of the defendant's attack upon Ms. Cooper, the defendant told her that on the previous Saturday he had seen her jogging and that he had also seen another girl that he was going to "get" but that there had been too many people in the vicinity. The defendant stated that he did not find anyone until Sunday (24 September). He then asked Ms. Cooper if she had read the newspapers and whether she knew about Ms. Gray. The defendant admitted that he kidnapped and killed Ms. Gray and that he had left her body a half mile from their present location. The defendant stated that Ms. Gray had died a slow and painful death. The defendant admitted that he had beaten Ms. Gray with a large stick, kicked her in the throat and then, standing on her back, strangled her with her sweater. The defendant asked Ms. Cooper if she wanted to die a fast or a slow death. The defendant told Ms. Cooper that he would not kill her until he had performed various sexual acts with her or until the following morning. The defendant also made a comparison between his sexual assault against Ms. Gray and his rape of Ms. Cooper. The defendant later stole Ms. Cooper's watch.

The defendant's statements concerning his crimes against Ms. Gray, if relevant, were admissible pursuant to N.C.G.S. § 8C-1, Rule 801(d). Rule 801(d) provides that the admissions of a party opponent are excepted from the general prohibition against the admission of hearsay evidence.

The defendant's statements were relevant because they tended to show that the murder "was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1988). A murder is especially heinous, atrocious, or cruel if it is a conscienceless or pitiless crime which is unnecessarily torturous to the victim and the brutality involved exceeds that normally present in a first degree murder. *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979); *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983). This aggravating circumstance may

also be found in those cases that present dehumanizing aspects not usually present in a first degree murder case. *State v. Blackwelder*, 309 N.C. 410, 306 S.E.2d 783 (1983).

The defendant told Ms. Cooper that the victim had "died [a] slow and painful death." The defendant admitted beating the victim's head with a stick, kicking her in the throat and finally standing on her back and strangling her. This evidence, which was corroborative of the findings of a pathologist, was relevant to show that the murder was unnecessarily torturous and that it exceeded the level of brutality normally present in a first degree murder.

The defendant's statement that he sexually assaulted the victim prior to killing her was corroborative of evidence that the victim suffered pre-death bruising in her anal area. Evidence that the defendant sodomized the victim prior to killing her has the tendency to show that there existed in this case dehumanizing aspects not normally present in a first degree murder. *State v. Blackwelder,* 309 N.C. 410, 306 S.E.2d 783. We find no error in the admission of these statements.

[19] The "other crimes" evidence, the evidence of the defendant's crimes against Ms. Cooper, was relevant if it tended to show that the murder was part of a course of conduct in which the defendant engaged which included acts of violence against another person. N.C.G.S. § 15A-2000(e)(11) (1988). Evidence tends to show a "course of conduct" if it shows that the "other crimes of violence were parts of a pattern of intentional acts directed toward the perpetration of such crimes of violence which establishes that there existed in the mind of the defendant a plan, scheme, or design involving both the murder of [the victim] and other crimes of violence." *State v. Cummings*, 332 N.C. 487, 508, 422 S.E.2d 692, 704 (1992), *quoting, State v. Williams*, 305 N.C. 656, 685, 292 S.E.2d 243, 261 (1982). In determining whether to submit the course of conduct aggravating circumstance, the trial court must consider "a number of factors, among them the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons." *State v. Price*, 326 N.C. 56, 81, 388 S.E.2d 84, 98, *sentence vacated*, --- U.S. ---, 112 L. Ed. 2d 7 (1990).

In *Cummings*, we held that this aggravating circumstance was properly submitted where the evidence showed that the defendant killed two women over a twenty-six month period. The defendant's

motivation for the murders was nearly identical and his *modus operandi* was the same. We also held in *Cummings* that in determining whether submission of this circumstance is proper, it weighs heavily in favor of submission where the multiple victims are from some associated group.

Ms. Cooper's testimony tended to show that in both cases the defendant's motivation and *modus operandi* were the same, the crimes were committed in close temporal proximity, and the defendant believed that both victims were members of an associated group. In each case, the defendant abducted the female victim, whom he believed to be an Appalachian State University student, as she was exercising on the streets of Boone. The defendant drove each of the victims to the same area of the county. The defendant sodomized both victims and stole their watches and articles of their clothing which he kept as mementos. The defendant told Ms. Cooper that he would have abducted her on a previous occasion, but that there were too many people around. He also told her that he planned to kill her as he had killed Ms. Gray. The defendant committed these crimes against Ms. Cooper just five days after he kidnapped and murdered Ms. Gray. We hold that this evidence was relevant to show a "course of conduct" because it tended to show that there existed in the mind of the defendant a plan, scheme, or design involving both the murder of the victim and other crimes of violence.

The defendant also assigns as error the admission of photographs of the victim and evidence of injury to her rectum. In addition, the defendant says it was error to admit evidence of the victim's disappearance, her friend's and family's concern for her safety, and the massive effort of law enforcement officers to locate her. The defendant says that this evidence was irrelevant. We disagree.

As previously discussed, evidence that the defendant anally raped the victim prior to murdering her was relevant to show that the murder was especially heinous, atrocious, or cruel. Thus, admission of evidence of injury to the victim's rectum was proper.

[20] Whether to admit photographic evidence requires a weighing of the evidence's probative value against the danger of unfair prejudice to the defendant. *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988); *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990). N.C.G.S. § 8C-1, Rule 403 (1986). Where the victim's identity and the cause

of his or her death are uncontroverted, a trial court may nevertheless allow in evidence photographs showing the condition of the body and its location when found. *State v. Wynne*, 329 N.C. 507, 406 S.E.2d 812 (1991).

The photographs at issue depicted the victim's nude body in an advanced stage of decomposition. The photographs also purported to depict the manner in which the victim was strangled and the injuries to her head. Although the victim's identity and the cause of her death were not in dispute, these photographs showed the circumstances of her death which were relevant to the issues to be determined in the sentencing proceeding. We find no error in admitting these photographs into evidence.

[21] The defendant's contention that the trial court allowed inadmissible "victim impact" evidence is without merit. Having reviewed the testimony to which the defendant assigns error, we have failed to find any testimony which in any way described how the defendant's crimes impacted the victim's family and friends. Rather, the witnesses described how they learned of the victim's disappearance and how they came to be involved in the search to find her. This testimony was foundational in nature and its admission was proper. This assignment of error is overruled.

[22] The defendant next assigns as error the trial court's exclusion of evidence that the trial court would sentence the defendant for his crimes against Ms. Cooper and his kidnapping of Ms. Gray after the conclusion of the capital sentencing proceeding. The defendant says that he was entitled to have the jury consider anything that it might deem to justify a sentence less than death, *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), and that evidence that he would receive appropriate sentences for his other crimes might mitigate against a sentence of death in this case. *Harris v. Maryland*, 312 Md. 225, 539 A.2d 637 (1988). Defendant says that in the absence of this evidence, the jury might conclude that its sentence recommendation was to apply to all the crimes committed by the defendant during his course of violent conduct. We disagree.

The excluded evidence would have tended to suggest that the statutorily available sentences would actually be imposed. Because such evidence was purely speculative, it was properly excluded. Additionally, the evidence was inadmissible on the ground that it was irrelevant. In *State v. Price*, 331 N.C. 620, 418 S.E.2d

169 (1992), *sentence vacated,* --- U.S. ---, 122 L. Ed. 2d 113 (1993), we held it was irrelevant in a sentencing proceeding "[t]hat defendant is currently serving a life sentence for another unrelated crime [because that sentence] is not a circumstance which tends to justify a sentence less than death for the capital crime for which defendant is being sentenced." *Price,* 331 N.C. at 634, 418 S.E.2d at 177. Likewise, that the defendant in this case would be sentenced for his other crimes was not a circumstance that would justify a sentence less than death for the murder for which he was being sentenced. Thus, we hold that the trial court did not err by excluding this evidence.

Assuming *arguendo* that the court's ruling was erroneous, the record shows that the defendant offered, and the court admitted, evidence that the defendant had previously entered pleas of guilty to the other crimes and that the defendant could receive four life sentences plus fifty years for those crimes. Thus, contrary to the defendant's argument, the jury was informed of what sentences might be imposed for his other crimes and that these sentences would be separate and distinct from his sentence for murder. Therefore, any error was harmless beyond a reasonable doubt. This assignment of error is overruled.

## Jury Argument

[23] The defendant next argues that the trial court erred by allowing the prosecutor to argue that the defendant's expert witnesses had contradicted one another. We disagree.

Where, as here, the defendant failed to object to the prosecutor's argument, the trial judge was required to intervene *ex mero motu* only if the argument was grossly improper. *State v. Mason,* 315 N.C. 724, 340 S.E.2d 430 (1986). A prosecutor "may not place before the jury incompetent and prejudicial matters not admissible in evidence or include in his argument facts not included in the evidence." *State v. Taylor,* 289 N.C. 223, 226, 221 S.E.2d 359, 362 (1976). Arguments before the jury are left largely to "the control and discretion of the trial judge who must allow wide latitude in the argument of the law, the facts of the case, as well as to all reasonable inferences to be drawn from the facts." *Id.*

In this case, the prosecutor argued in relevant part as follows:

You heard from a doctor from Bowman Gray Hospital, Dr. Lindal [sic], Chief Resident Neurosurgeon at Baptist Hospital. He told you that Daniel Gray [sic] had some brain damage. That it was in a motor skill area. . . . And he said the chances that that might cause some personality change was pure hypothesis. A pure, as he told the Judge, a pure guess that it might. . . .

[Y]ou recall after Dr. Lindal [sic] the next witness who testified, he was not a medical doctor, he was a psychologist [Dr. Sciara]. . . .

[H]e came in and said I know for a fact that this brain damage has caused this change, this drastic change in Daniel Lee. And I want you to think about that. Here is a psychologist, who is totally, totally contradicting what the Chief Resident of Neurosurgery at Baptist Hospital says.

We have reviewed the record and find that the prosecutor's argument was supported by the evidence. Dr. Lindley was unable to testify to a reasonable degree of medical certainty that the defendant's behavioral and emotional changes were symptoms of his brain damage. Rather, Dr. Lindley could only hypothesize that the defendant's brain damage had caused such changes. Dr. Sciara, however, testified in no uncertain terms that the behavioral and emotional changes experienced by the defendant were the direct result of the defendant's brain aneurysm and subsequent brain surgery.

In his argument, the prosecutor identified this difference in the witnesses' testimony as the basis for his argument that the experts had contradicted one another. Given the wide latitude that is afforded counsel during jury arguments, and considering the differences in the witnesses' testimony, we hold that the prosecutor could properly argue that the evidence was contradictory. This assignment of error is overruled.

[24] The defendant next asserts that the trial court should have intervened *ex mero motu* to prevent the following portion of the prosecutor's argument:

The time has come to say . . . to Daniel Lee we will not tolerate these terrible conscienceless crimes that you have committed. To say to those who would follow in his footsteps beware, beware.

> Why capital punishment? Because there is only one way
> that we can insure that no other person shall ever fall pray
> [sic] to Daniel Brian Lee.

The crux of this argument was twofold. First, the prosecutor asserted
that if the jury returned a recommendation of death, it would
be signaling the community that capital felons would be dealt with
severely. Second, the prosecutor argued the only way to prevent
the defendant from killing again was for the jury to return a recom-
mendation of death.

In *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470, this court
found proper a prosecutor's argument that its verdict would " 'send
a message to the community' about what may befall a person con-
victed of murder in a court of justice." 325 N.C. at 329, 384 S.E.2d
at 499. In *State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752 (1979),
this Court found no error in a prosecutor's repeated argument
that the only way to insure that the defendant would not kill
again was to sentence him to death.

Considering the prosecutor's argument in the present case
in light of these prior decisions, we hold that this was a proper
argument. This assignment of error is overruled.

### Jury Instructions

[25]  Under his next assignment of error, the defendant contends
that the trial court erred by refusing to instruct the jury peremp-
torily that at the time of the murder, the defendant's capacity
to appreciate the criminality of his conduct or to conform his
conduct to the requirements of the law was impaired. N.C.G.S.
§ 15A-2000(f)(6) (1988). The defendant argues that this mitigating
circumstance was supported by credible and uncontroverted evidence,
thus requiring the court to give a peremptory instruction. *State
v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied*, 469
U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85
L. Ed. 2d 342 (1985). We disagree.

As we have already discussed, the defendant's expert witness,
Dr. Lindley, was unable to testify with a reasonable degree of
medical certainty that the defendant's brain injury resulted in any
change in the defendant's condition other than some diminution
in his motor skills. Other witnesses described the defendant's physical
appearance both before and after his hospitalization. These witnesses

generally described the defendant's physical appearance as having deteriorated following his brain surgery. They described the defendant as being more withdrawn and less goal-oriented. Other witnesses described changes in the defendant's sexual attitudes.

While this evidence tends to show some psychological changes in the defendant, it falls short of showing that the defendant suffered from an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

In addition, there was other evidence which tended to show the nonexistence of this mitigating circumstance. Sheriff Lyons testified that the defendant had always obeyed the rules that governed inmates in the Watauga County jail; that he always followed the Sheriff's instructions when he was being transferred to and from various court proceedings; that the defendant's behavior in jail had been inconsequential; and, that the defendant had never attempted to escape from custody. This evidence tended to show that the defendant was capable of conforming his conduct to the requirements of the law. Therefore, we hold that the evidence of this statutory mitigating circumstance was not uncontroverted. The trial court properly refused the defendant's request for a peremptory instruction.

The defendant next contends that the trial court improperly instructed the jury concerning its use of the evidence of the defendant's crimes against Ms. Cooper. The trial court instructed, in accordance with the pattern jury instruction, as follows:

Evidence has been received *tending to show* that certain acts occurred between the defendant and the witness, Leigh Cooper. This evidence was received solely for the purpose of showing that the defendant had a motive for the commission of the crime charged in this case, the murder of Jennifer Gray, and that there existed in the mind of the defendant a plan, scheme, system, or design involving the crime charged in this case. If you believe this evidence you may consider it, but only for the limited purpose for which it was received. (Emphasis added.)

The defendant argues that this instruction was erroneous because the phrase "tending to show" amounted to an impermissible judicial comment on the evidence; the instruction allowed the jury to con-

sider the evidence on the issue of a "plan" or "scheme," when the evidence was only relevant to the "course of conduct" aggravating circumstance; and, the instruction permitted consideration of the evidence on the question of motive which the defendant says was irrelevant. We disagree.

[26]   This Court has consistently held that a trial court's use of the phrase "tending to show" in reviewing the evidence does not constitute an expression of judicial opinion on the evidence. *State v. McKoy*, 331 N.C. 731, 417 S.E.2d 244 (1992); *State v. Young*, 324 N.C. 489, 380 S.E.2d 94 (1989). We hold that the trial court's use of these words in the present case was proper.

[27]   Nor did the trial court err by allowing the jury to consider the defendant's crimes against Ms. Cooper on the issue of "plan," "scheme," and "motive." As we have already discussed, and as the trial court instructed the jury, the "course of conduct" aggravating circumstance is proven by showing that there existed a "plan" or "scheme" in the mind of the defendant involving both the murder and other crimes of violence. *State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692; *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243. Likewise, similarity of motive is relevant to determining the existence of the "course of conduct" circumstance, *State v. Cummings*, and could properly be considered by the jury. This assignment of error is overruled.

[28]   By his next assignment of error the defendant contends that the trial court erred by submitting the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1988). The defendant contends that the evidence was insufficient to support submission of this aggravating circumstance. We disagree.

A murder is "especially heinous, atrocious, or cruel" if it is a conscienceless or pitiless crime which is unnecessarily torturous to the victim or where the level of brutality involved exceeds that normally found in a first degree murder. *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984). The first of two types of first degree murders where submission of this circumstance are proper are those which are physically agonizing for the victim or which are in some other way dehumanizing. *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304. The second type are those where the victim is psychologically tortured; where the victim is aware of but unable to prevent her impending death. *Id.*

The State's evidence showed the victim was kidnapped at gun point, stripped naked, driven to another location where she was forced to walk or run to the place where she was beaten on the head, kicked in the throat and strangled by the defendant. The defendant said the victim died a slow and painful death. We believe the jury could find from this evidence that the victim's death was particularly dehumanizing and was especially cruel.

[29]  The defendant, relying on *State v. Trexler*, 316 N.C. 528, 342 S.E.2d 878 (1986), argues that the *corpus delicti* rule as to the admission of confessions should be applied to the proof of an aggravating circumstance. He says that the testimony of Ms. Cooper, that the defendant told her Ms. Gray had died a slow and painful death, was not corroborated by independent evidence and it should have been excluded.

The *corpus delicti* rule, as stated in *Trexler*, has no application to this case. The defendant pled guilty to first degree murder. This established that a crime had been committed. The testimony as to the defendant's description of the crime was admissible.

[30]  The defendant next contends that the trial court committed plain error in its instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance. The defendant, relying on the United States Supreme Court decisions in *Shell v. Mississippi*, 498 U.S. 1, 112 L. Ed. 2d 1 (1990) and *Maynard v. Cartwright*, 486 U.S. 356, 100 L. Ed. 2d 372 (1988), says that the instruction given in this case was unconstitutionally vague. We disagree.

The instruction given in the instant case is virtually identical to the instruction given in *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990). The instruction given in both cases came from N.C.P.I.— Crim. 150.10. In *Fullwood*, we considered the defendant's argument, based on the *Maynard* decision, that this instruction was unconstitutionally vague. In that case we held, pursuant to *Proffitt v. Florida*, 428 U.S. 242, 49 L. Ed. 2d 913 (1978), that the instruction given by the trial court on this aggravating circumstance provided the jury with adequate guidance in determining the existence of this circumstance. The United States Supreme Court's *per curiam* decision in *Shell* adds nothing to its prior decision in *Maynard*. Because we have already determined, after considering the *Maynard* decision, that the instruction given in this case passes constitutional muster, we overrule this assignment of error.

STATE v. LEE

[335 N.C. 244 (1994)]

[31] By his next assignment of error, the defendant challenges the constitutionality of the pattern capital sentencing instructions which were adopted as a result of the decision in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

In *McKoy*, the United States Supreme Court held that the unanimity requirement of North Carolina's capital sentencing scheme was unconstitutional because it prevented "the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find." *McKoy*, 494 U.S. at 435, 108 L. Ed. 2d at 376. A sentencer may not be precluded from giving effect to all mitigating evidence. *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384 (1988); *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973. In *Mills*, on which the *McKoy* decision was based, the Court reasoned that a unanimity requirement allows a single juror's holdout vote on a particular mitigating circumstance to prevent the remainder of the jury from giving that circumstance any effect when weighing mitigating circumstances against aggravating circumstances. *Mills*, 486 U.S. at 376, 100 L. Ed. 2d at 393.

In the instant case, the trial court instructed the jury in Issue Two, in accordance with *McKoy*, that if *one or more* jurors found a mitigating circumstance to exist they should write "yes" in the space provided. With regard to the third sentencing issue, the weighing issue, the court instructed in pertinent part as follows:

> If you find from the evidence one or more mitigating circumstances, you *must* weigh the aggravating circumstances against the mitigating circumstances. When deciding this issue, each juror *may* consider any mitigating circumstance or circumstances that *he or she determined to exist* by a preponderance of the evidence in Issue Two. (Emphasis added.)

With regard to determining the fourth issue, whether the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty, the court instructed:

> In deciding this Issue Four, you are not to consider the aggravating circumstances standing alone. You *must* consider them in connection with any mitigating circumstances *found by one or more of you*. When making this comparison, each juror *may* consider any mitigating circumstance or circumstances *that juror determined to exist* by a preponderance of the evidence. (Emphasis added.)

The defendant says these instructions were improper because they utilized the permissive word "may" instead of the imperative words "shall" or "must." The defendant argues that these instructions allowed jurors to disregard properly found mitigating circumstances. The defendant also contends that each juror should be required to consider every mitigating circumstance found by any one of the jurors. We disagree.

The jury was instructed under Issue Three that it *must* weigh any mitigating circumstances it found to exist against the aggravating circumstances. This directive to weigh the mitigating circumstances against the aggravating circumstances is not ambiguous. The next sentence of the instruction describes which mitigating circumstances are to be considered by the jurors in this weighing process. The word "may" indicates that each juror is allowed to consider those mitigating circumstances that he or she may have found to exist by a preponderance of the evidence.

The rule of *McKoy* is that jurors may not be prevented from considering mitigating circumstances which they found to exist in Issue Two. Far from precluding a juror's consideration of mitigating circumstances he or she may have found, the instant instruction expressly instructs that the evidence in mitigation *must* be weighed against the evidence in aggravation. Thus, the instruction given by the trial court fully comports with the decision in *McKoy*.

Nor are we persuaded by the defendant's contention that *McKoy* requires a juror to consider, at Issue Three and Issue Four, those mitigating circumstances which he or she did not find, but which were found by one or more other jurors. Were we to adopt this reading of *McKoy* and its progenitors, we would create an anomalous situation where jurors are required to consider mitigating circumstances which are only found to exist by a single holdout juror. We do not believe that the decisions in *McKoy* or *Mills* intended this anomalous result. The jury charge given in this case did not preclude the jurors from giving effect to all mitigating evidence they found to exist. This charge eliminates the defect found unconstitutional in *McKoy*. This assignment of error is overruled.

[32] By his next assignment of error, the defendant asserts the trial court erred by refusing to submit as a nonstatutory mitigating circumstance that "Daniel Lee's inability to . . . conform his conduct to the requirements of the law was by reason of his mental defect

and not of his own making." For the following reasons, we hold that the trial court properly refused to submit this nonstatutory mitigating circumstance.

A trial court errs if it refuses a defendant's written request to submit a nonstatutory mitigating circumstance which is sufficiently supported by the evidence unless the requested circumstance is subsumed by a mitigating circumstance which is submitted. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). In this case, the trial court submitted two statutory mitigating circumstances that concerned the defendant's mental or emotional condition at the time of the killing. These were N.C.G.S. § 15A-2000(f)(6) "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired" and N.C.G.S. § 15A-2000(f)(2) "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance." The court also submitted the following nonstatutory mitigating circumstance:

> [W]hether the defendant did not himself know or fully appreciate his mental condition and dangerousness at the time of the murder, or whether he had not been warned that his mental condition might lead to an inability to control his conduct or to conform it to the requirements of the law, and whether you deem this to have mitigating value.

The jury found all three of these mitigating circumstances. We believe these three mitigating circumstances which were submitted allowed the jury to determine whether the defendant's mental condition was self induced. This assignment of error is overruled.

[33] The defendant next contends there was error in the court's instruction in which it defined aggravating and mitigating circumstances. The defendant requested that the court charge the jury that aggravating circumstances are circumstances "that tend to make a specific Defendant particularly appropriate for the most serious and final punishment prescribed by law." The court refused this request and charged the jury that "[a]n aggravating circumstance is a fact or group of facts which tend to make a specific murder particularly deserving of the maximum punishment prescribed by law." The court also charged that "[a] mitigating circumstance or factor is a fact or group of facts, which . . . may be considered as extenuating or reducing the moral culpability of the killing or

making it less deserving of extreme punishment than other first degree murders."

The defendant says the instruction of the court caused the jury to focus on the crime rather than the defendant as required by *South Carolina v. Gaithers*, 490 U.S. 805, 104 L. Ed. 2d 876 (1989). This charge as to aggravating and mitigating circumstances was approved in *State v. Price*, 326 N.C. 56, 388 S.E.2d 84 and *State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981). This assignment of error is overruled.

[34] The defendant next assigns as error the trial court's refusal to charge the jury that Article I, Section 27 of the North Carolina Constitution provides that no person shall be subjected to either cruel or unusual punishment and that if the jury determined, in light of the defendant's individual circumstances, that the punishment of death would be cruel or unusual, that the jury should return a recommendation of life imprisonment.

Whether a sentence constitutes cruel or unusual punishment is a question of law and is therefore not a question to be resolved by a jury. Moreover, we have repeatedly determined that North Carolina's capital sentencing scheme does not violate the constitutional prohibition against cruel or unusual punishments. *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 939 (1988); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 232 (1991). We hold that the trial court's refusal to give the defendant's proffered instruction was not error.

[35] By his next assignment of error, the defendant contends that the trial court committed plain error in its instruction regarding expert testimony. The instruction described an expert as one who "purports to have specialized skill or knowledge." The defendant says this instruction was plainly erroneous because an expert, as a matter of law, is a person who has been determined by the court to have such skill or knowledge. We disagree.

In *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987), we considered the propriety of a virtually identical instruction and found it to be sufficient. We have reviewed the court's entire charge and found it to be a correct explanation of the basis for and use of expert opinions and cannot say that it was erroneous.

[36]   Next, the defendant contends that the trial court erred by denying the jury's request to "have a copy of the testimony of the neurosurgeon and the neuropsychologist?" N.C.G.S. § 15A-1233(a) provides in pertinent part:

> The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence.

Whether to allow the jury to review a witness's testimony is a matter solely addressed to the discretion of the trial court. *State v. Burgin*, 313 N.C. 404, 329 S.E.2d 653.

The defendant contends that the trial judge did not exercise his discretion in denying the jury's request and that even if he did exercise his discretion, he did so improperly. We disagree. The record shows that in denying the jury's request, the judge made the following statement:

> For you to have that and not have a copy of all of the testimony might cause something to be taken out of context or unduly— place undue emphasis on this. It is your duty to use your own recollection and recall the evidence as you heard it from the witness stand.

In response to defense counsel's request that the testimony be provided to the jury, the judge continued:

> [I]t is not in a form where it can be readily copied without a great deal of time, and as I said the Court has determined that it might unduly emphasize that testimony to the exclusion of other testimony and it's the duty of the jury to consider and recall all of the testimony they heard. . . .

It is clear from this record that the trial court was aware of its authority to exercise its discretion and allow the jury to review the expert's testimony. It is also clear that the court's decision was made in an effort to conserve time and to ensure that all evidence received equal consideration. The defendant has not shown that the trial court abused its discretion by denying the request or that the reasons stated for the denial were improper. This assignment of error is overruled.

[37].  The defendant next assigns error to the requirement by the court that Dr. Sciara, the psychologist who testified as an expert

STATE v. LEE

[335 N.C. 244 (1994)]

for the defendant, furnish the State a written report of his examination of the defendant. The State paid for the psychological examination pursuant to *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985).

The defendant does not contend it would have been error to require Dr. Sciara to furnish the State with a report if he had previously prepared it. He says the court could not require such a written report. The defendant argues that the State does not have the right to this discovery at common law and there is not a statute providing for the type discovery allowed in this case.

N.C.G.S. § 15A-905(b) provides for the inspection and copying by the State of reports of mental examinations which relate to the testimony of a witness. It does not mention the authority of the court to require that a written report be prepared, but we believe that within the meaning of the statute is the requirement that the State be provided in advance of the witness' testimony with a meaningful report which the State can use in preparation for trial. We hold that it was not error under the statute for the court to order Dr. Sciara to prepare such a report in this case.

## Verdict

[38] By his next assignment of error, the defendant argues that the trial court erred by refusing his request that the jurors be polled as to how they individually answered each of the proffered mitigating circumstances. The defendant says that the trial court's ruling hampers this Court's ability to conduct meaningful proportionality review. We disagree.

N.C.G.S. § 15A-2000(b) states that "[u]pon delivery of the sentence recommendation by the foreman of the jury, the jury shall be individually polled to establish whether each juror concurs and agrees to the sentence recommendation returned." Clearly, this statute only contemplates polling the jurors regarding their final recommendation. Nothing in this statute indicates that jurors should be polled as to their individual answers to the individual issues addressed during sentencing deliberations. The trial court's refusal to poll the jurors regarding their individual answers to the proffered mitigating circumstances was not error. *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642; *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732, *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1981). We overrule this assignment of error.

[39] By his next assignment of error, the defendant contends that his death sentence should be vacated on the ground that the jury failed to find several nonstatutory mitigating circumstances which, the defendant contends, "were manifestly supported by the evidence and mitigating as a matter of law[.]" The mitigating circumstances which the defendant says should have been found were that he had entered pleas of guilty to every crime he was accused of committing; that he had a good work history; and, that he had adjusted well to incarceration and would be of benefit to society if sentenced to life imprisonment.

Before a juror can find a nonstatutory mitigating circumstance, he or she must find the circumstance to exist and that the circumstance has mitigating value. *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518. We agree with the defendant's contention that the existence of these circumstances was supported by the evidence. However, these circumstances do not have mitigating value as a matter of law. It is the jury's duty to determine whether proffered nonstatutory mitigating circumstances make the defendant less deserving of a sentence of death. *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518; *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *sentence vacated*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). Thus, despite substantial evidence of the existence of a proffered nonstatutory mitigating circumstance, a jury's failure to find that the circumstances have mitigating value does not require that the defendant's sentence of death be set aside. This assignment of error is overruled.

## Preservation Issues

The defendant brings forth seven additional issues for this Court's review. In their brief, defense counsel candidly concedes that these issues have previously been decided by this Court adversely to the position taken by the defendant. Nevertheless, the defendant asks us to reevaluate these prior decisions. Having considered the defendant's arguments, we are not persuaded to abandon our prior holdings. These assignments of error are overruled.

## Proportionality Review

Having determined that there was no error in the defendant's sentencing proceeding, we are required by N.C.G.S. § 15A-2000(d) to determine (1) whether the record supports the jury's finding of the aggravating circumstances upon which the sentence of death

was imposed, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence is excessive or disproportionate to the penalty imposed in the pool of similar cases, considering both the crime and the defendant.

The jury found three aggravating circumstances in the murder of Jennifer Gray. These were that the murder was committed during the course of a kidnapping, that the murder was especially heinous, atrocious, or cruel, and that the murder was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person.

As already discussed herein, the record clearly supports the jury's finding that this murder was especially heinous, atrocious, or cruel and part of a "course of conduct" involving crimes of violence against another person. Although not addressed herein, the record also supports a finding that this murder was committed in the course of a kidnapping. The existence of this aggravating circumstance was conceded by the defendant during the sentencing proceeding.

Having thoroughly examined the record, transcripts and briefs in this case, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factors.

[40] We now turn to our final statutory duty of conducting a proportionality review. In determining whether the sentence of death is disproportionate, we consider both the defendant and the crime, and compare them to a pool of similar cases. *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). In *Williams*, we said that the pool of similar cases to which we would compare the case under review, would consist of:

> *[A]ll cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E.2d at 355 (emphasis in original). The pool of similar cases includes only those cases which this Court has found to be free from error in both phases of the trial. *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

Our review is intended to eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury. *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986). In furtherance of this purpose, we

> compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*State v. Lawson,* 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied,* 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). However, while we expressly analogize and distinguish many cases, we do not feel bound to cite all cases that we consider. *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335.

At the outset, we note as this Court has previously observed, juries consistently return recommendations of death in those cases where the victim was sexually assaulted, *State v. Holden,* 321 N.C. 125, 167, 362 S.E.2d 513, 538. Furthermore, this Court has never found a sentence of death to be disproportionate where the victim was sexually assaulted. *State v. Artis,* 325 N.C. 278, 384 S.E.2d 470; *State v. Roper,* 328 N.C. 337, 402 S.E.2d 600. Nevertheless, we must compare this defendant and this crime to similar defendants and similar crimes.

Some of the distinguishing features of the crime in this case were its violent, sexual character, and that it was part of a "course of conduct." Pertinent traits of the defendant were his law abiding history, his mental or emotional disturbance, and his lack of capaci-

ty to conform his conduct to the requirements of the law. Thus, we will endeavor to compare this case to other cases where the crime and the defendant were similar.

In reviewing the cases in the pool, we have found several cases meeting these criteria where the juries returned recommendations of death. In *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732, the victim was beaten, cut, raped, and driven over with a car. The defendant's first degree murder conviction was based on theories of premeditation and deliberation and felony murder. In mitigation, we assumed that the jury found that the defendant was acting under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct was impaired. The jury returned a recommendation of death. We found that sentence to be proportionate.

In *State v. Smith*, 305 N.C. 691, 292 S.E.2d 264 (1982), the defendant kidnapped three female college students with the use of a blank pistol. The defendant ordered that he be driven to a remote area in the country. There, the defendant raped, robbed and murdered one of the victims. The jury found as a mitigating circumstance that the defendant was under the influence of a mental or emotional disturbance. On review, we found the defendant's death sentence to be proportionate.

In *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), the defendant, after injecting cocaine, gained entry into the victim's home by guile, where he cut and stabbed the victim to death with a butcher knife. There was substantial evidence that the defendant killed the victim while attempting to rape her. Like the instant case, the jury in *McDougall*, found that the murder was part of a "course of conduct." The jury also found that the defendant was acting under the influence of a mental or emotional disturbance, and his capacity to appreciate the criminality of his conduct was impaired. This Court found McDougall's sentence of death to be proportionate.

In *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513, the victim was a passenger in the defendant's car. She was very drunk. The defendant parked his car, tied the victim's legs together, and fondled her breasts. Shortly thereafter, the defendant drove the victim to a secluded area where he attempted to rape her. The defendant killed the victim by shooting her in the neck and slashing her throat. The jury found three aggravating circumstances and no

mitigating circumstances. This court found the recommendation of a sentence of death to be proportionate.

In *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, the defendant stated to a witness that he was going to rape a female acquaintance and that if it was necessary to kill the victim in order to rape the female, he would do so. The defendant thereafter shot the victim in the head as the victim rode in a truck with the female that the defendant intended to rape. After shooting the victim, he transported the female to another location where he threatened her life and raped her. The jury found two aggravating circumstances, including the "course of conduct" aggravator. The jury also found all fifteen submitted mitigating circumstances, including the defendant's age and his impaired capacity to appreciate the criminality of his conduct. The jury returned a recommendation of death. This Court found the defendant's sentence to be proportionate.

We have also reviewed several cases where defendants received sentences of life imprisonment for first degree murders which also involved some sort of sexual offense. *State v. Prevette*, 317 N.C. 148, 345 S.E.2d 159 (1986); *State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1983); *State v. Franklin*, 308 N.C. 682, 304 S.E.2d 579 (1983); *State v. Temple*, 302 N.C. 1, 273 S.E.2d 273 (1981); *State v. Clark*, 301 N.C. 176, 270 S.E.2d 425 (1980). These cases however are distinguishable from the instant case with regard to either the defendant or the crime.

In none of these cases did the jury find the aggravating circumstance that the murder was part of a course of conduct in which the defendant engaged which included acts of violence against another person. The absence of this aggravating circumstance in these cases tends to show that juries are more hesitant to impose the death penalty where the crime was committed in response to a specific set of circumstances rather than as part of a plan or scheme to commit numerous acts of violence against numerous victims.

Additionally, in the cases where the defendants received life sentences, the juries found fewer aggravating circumstances than were found here. In the instant case, the jury found three aggravating circumstances. In two of the cases where life imprisonment was recommended, the jury found two aggravating circumstances. *Clark; Powell.* In the other three cases, life sentences

STATE v. LEE

[335 N.C. 244 (1994)]

were imposed where the jury found only one aggravating circumstance. *Fincher; Franklin; Temple.*

Furthermore, in three of these cases, *Fincher, Franklin*, and *Powell*, the defendants were convicted of murder based solely on the theory of felony murder. A conviction based on the theory of premeditation and deliberation, like the defendant's conviction in the present case, indicates a more calculated and cold-blooded crime. *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470.

Our review has also revealed two cases where juries found the same three aggravating circumstances found in this case. *State v. Erlewine*, 328 N.C. 626, 403 S.E.2d 280 (1991); *State v. Thompson*, 328 N.C. 477, 402 S.E.2d 386 (1991). The defendants in *Erlewine* and *Thompson*, upon recommendation by the juries, were sentenced to life imprisonment. However, the crimes and the defendants in those cases are readily distinguishable from this case.

In *Erlewine*, the defendant, acting with an accomplice, planned to go to the victims' home for the purpose of robbing them of money and cocaine. After injecting themselves with cocaine, the defendant and his accomplice armed themselves with shotguns. The men then entered the victims' home, under the pretense of paying a debt, and demanded to be given the money and cocaine. The victims were then ordered into a bedroom where they were shot in the head and face. One victim died, the other was seriously maimed. Money and cocaine were stolen from the victims.

In *Thompson*, the seventeen-year-old defendant was convicted of two counts of first degree murder. The defendant and his accomplice were engaged in the fantasy game "Dungeons and Dragons" when they entered the home of the elderly couple that were their victims. Both victims died of multiple stab wounds. The defendant and his accomplice then stole numerous items of the victims' personal property.

The crimes in *Erlewine* and *Thompson* are dissimilar from the crime in the case under review in several respects. In the instant case, the defendant's primary motivation was the perpetration of unnatural and violent sexual acts with the victim. The defendant, acting alone, methodically sought out Appalachian State University female students as they exercised on the streets of Boone. The defendant kidnapped the victim with the intent to sexually assault and murder her. The crimes the defendant committed

STATE v. LEE

[335 N.C. 244 (1994)]

against the victim occurred over a period of several hours. During this time, the victim undoubtedly experienced extreme psychological and physical torture.

On the other hand, the defendants' primary motive in *Erlewine* and *Thompson*, was robbery. In addition, the crimes in those cases were committed in a relatively short period of time. Although the victims in those cases suffered physically and psychologically, their suffering was not as protracted as Ms. Gray's. We also find it significant that the defendants in *Erlewine* and *Thompson* acted in concert with another person.

In addition to the different circumstances of the crimes in *Erlewine* and *Thompson*, the defendants in those cases were different from the defendant in this case. In *Erlewine*, the jury found in mitigation that the defendant acted under duress or the domination of another person. In *Thompson*, the defendant was a minor and the jury found his age, seventeen, at the time of the crime, as a mitigating circumstance. Thus, we find *Erlewine* and *Thompson* to be far more dissimilar to the defendant and crime in this case than they are similar.

For the foregoing reasons, we find that the defendant in this case more closely resembles the defendants in the sex-related murders where the defendants were sentenced to death than he does those defendants who were sentenced to life imprisonment. Likewise, the defendant's crime was one of cold calculation wherein he repeatedly sought to abduct, sexually assault, and then murder female Appalachian State University students. Such a repeated pattern of conduct was absent in those cases where the defendants were sentenced to life imprisonment.

Based on our review, comparing this case to similar cases, we are convinced that the defendant's sentence of death is not disproportionate and not the result of the actions of an aberrant jury. We therefore decline to set it aside.

NO ERROR.

Justices Whichard and Parker did not participate in the consideration or decision of this case.

STATE v. LEE

[335 N.C. 244 (1994)]

Justice FRYE dissenting.

The majority holds, quite correctly I believe, that it was error for the trial court to refuse to allow the neuropsychologist, Dr. Sciara, to attempt to resolve any of the apparent conflicts between his and Dr. Lindley's testimony. I do not agree, however, with the majority's conclusion that the error was not prejudicial. Assuming that the majority is correct that the test for prejudice for this error is whether there is a reasonable possibility that had the error not occurred, a different result would have been reached at this capital sentencing proceeding, I conclude that defendant has met his burden of showing that such a possibility exists. N.C.G.S. § 15A-1443(a) (1988). Finding the error prejudicial, I vote for a new capital sentencing proceeding.

I note first that defendant pled guilty to murder in the first degree, thus admitting that he unlawfully killed the victim with malice, premeditation and deliberation. The purpose of the sentencing proceeding was to have the jury recommend to the court whether defendant should be sentenced to death or to life imprisonment for this crime. In making this binding recommendation, at least some of the jurors may have found it significant whether the abrupt changes in defendant's behavior were attributable to his recent brain injury and subsequent operation, or whether defendant was simply a "mean young man." The testimony of Dr. Sciara would support the former conclusion while the testimony of Dr. Lindley would suggest the latter. Yet, when Dr. Sciara tried to explain Dr. Lindley's testimony "because I think its important," the trial judge interrupted by telling Dr. Sciara that "the jury has heard his testimony too, its for them to decide what his testimony is, not for you to explain it to them, what somebody else's testimony was, Doctor." I conclude that this was error prejudicial to defendant for the following reasons, among others.

First, the neurosurgeon made it clear that a neuropsychologist would be better qualified than he to determine the extent of personality and behavior changes caused by brain damage. As a neuropsychologist, Dr. Sciara attempted to explain the apparent inconsistencies between his testimony and that of the neurosurgeon. Preventing him from doing so was prejudicial to defendant. Dr. Sciara's testimony in this regard could have been helpful to the jury in weighing the mitigating circumstances against the ag-

STATE v. LEE

[335 N.C. 244 (1994)]

gravating circumstances in order to determine if the aggravating circumstances called for imposition of the death penalty.

During the jury argument, the prosecutor took advantage of the apparent inconsistencies in the evidence by arguing that defendant's expert witnesses had contradicted one another. The prosecutor argued at length about the contradictions between the testimony of the two experts — placing emphasis on the qualifications of Dr. Lindley as "Chief Resident of Neurosurgery at Baptist Hospital" while emphasizing that Dr. Sciara "was not a medical doctor, he was a psychologist." Likewise, the prosecutor told the jury that the neurosurgeon had testified that the chance that the brain damage might have caused some personality change "was pure hypothesis" while the psychologist "came in and said I know for a fact that this brain damage has caused this change." The prosecutor continued: "Here is a psychologist, who is totally, totally contradicting what the Chief Resident of Neurosurgery at Baptist Hospital says."

The majority concludes that the prosecutor's argument was supported by the evidence. If so, that is an additional argument for concluding that the error in not permitting the neuropsychologist to attempt to explain the apparent contradictions between his testimony and that of the neurosurgeon was prejudicial to defendant. Apparently the jury was troubled by the differences in the testimony of the two experts. The jury requested a copy of the testimony of the neurosurgeon and the neuropsychologist. The trial judge denied the request, telling the jurors, *inter alia*, that it was their "duty to use [their] own recollection and recall the evidence as [they had] heard it from the witness stand." However, because of the judge's interruption of the witness' response on cross-examination, the jury had been prevented from hearing all of the evidence that should have been given from the witness stand. Thus, the judge's rulings related to this issue permitted the prosecutors' contentions to prevail: 1) that the neurosurgeon's testimony was true, and 2) the conflicting testimony of the neuropsychologist should be ignored.

I conclude that there is a reasonable possibility that had this error not occurred, a different result would have been reached at the sentencing proceeding. N.C.G.S. § 15A-1443(a). Had the neuropsychologist been permitted to fully explain the apparent contradictions between his testimony and that of the neurosurgeon, the

jury may have concluded that the terrible crimes committed by defendant were at least partially attributable to his recent brain damage and brain operation and that his punishment should be life imprisonment rather than death.

Finally, Dr. Sciara's testimony was consistent with that of numerous lay witnesses who testified that defendant's behavior underwent extreme changes following the brain operation. Had the court not interrupted Dr. Sciara's explanation, his testimony would have lent credence to the lay witnesses' testimony that defendant changed from being a polite, nonviolent, considerate, and clean young man, before the operation, to one who was unclean, lethargic, unreliable, perverse and demanding after the operation.

Because I find prejudicial error in the sentencing proceeding entitling defendant to a new capital sentencing proceeding, I find it unnecessary to reach the issue of whether the sentence of death in this case is disproportionate, considering both the crime and defendant, when compared to the pool of similar cases.

Chief Justice EXUM joins in this dissenting opinion.